### In re BALLARD.

(District Court, N. D. Texas.   February 27, 1922.)

1. **Bankruptcy** ⬅140(1)—**Immaterial that sellers of wheat would have received flour in exchange before bankruptcy, except for food regulations.**

    Farmers, delivering wheat to a mill in exchange for certificates containing a promise to deliver a specified quantity of flour, bran, or shorts therefor, are presumed to have known and expected to conform to Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅛a–3115⅛cc, 3115⅛e–3115⅛g, and it is immaterial, on the bankruptcy of the owner of the mill, that they would have obtained the flour long before bankruptcy, but for the rules of the United States Food Administration.

2. **Evidence** ⬅461(1)—**Parol evidence as to what parties to contract intended, etc., inadmissible when written contract not ambiguous.**

    Where farmers delivered wheat to a mill in exchange for certificates providing for the delivery in exchange of flour, bran, or shorts, parol evidence as to what they intended, and as to whether the wheat would have been redelivered, if demanded, was inadmissible on the question whether the transaction was a sale or a bailment, as such evidence is not admissible when the contract is unambiguous.

3. Courts ☞359—Whether transaction was sale or bailment of wheat exchanged for flour, etc., held governed by state law.

Whether a delivery of wheat to a mill in exchange for the miller's promise to deliver flour, bran, or shorts was a sale or a bailment depends on whether the return of the wheat could have been compelled, and this is not a federal question, but controlled by the law of the state.

4. Courts ☞370—Decisions of United States courts followed, in absence of state decisions.

In the absence of a decision of the highest court of the state as to the validity of a lien, the court of bankruptcy will be governed by the decisions of the United States courts.

5. Sales ☞4(1)—Exchange of wheat for flour, etc., held "sale," and not "bailment."

The delivery of wheat to a mill in exchange for the mill owner's promise to deliver specified quantities of flour, bran, or shorts constituted a "sale" or exchange, by which title passed, and not a "bailment."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Bailment; Sale.]

6. Bankruptcy ☞396(1)—Bankrupt not entitled to exemption of salary from his own business.

A bankrupt is not entitled to an exemption with respect to any salary from a business which was his own business, operated under a trade-name.

7. Bankruptcy ☞398(2)—Right of third person to exempt property not determinable in bankruptcy court.

The bankruptcy court is not the proper forum to decide whether a bank of which the bankrupt acted as manager is entitled to exemptions allowed the bankrupt under the laws and Constitution of the state, on the theory that they were purchased with its money.

8. Bankruptcy ☞396(1)—Homestead, furniture, library, automobile, and hogs held exempt under state laws.

Under Rev. St. Tex. art. 3785, a bankrupt *held* entitled to an exemption of his homestead, household and kitchen furniture, library, and automobile, and 20 hogs owned by him.

9. Bankruptcy ☞140(½)—Bank not entitled to claim property purchased by its manager with its funds, to prejudice of mortgagees and attaching creditors.

Whether a bank was a partnership or a joint-stock company, where its manager was clothed with full authority to manage its funds, it can assert no claim to specific property purchased with its money to the prejudice of mortgagees and attaching creditors, represented by the trustee in bankruptcy.

10. Partnership ☞42—Stockholders in unincorporated bank held to constitute a "partnership."

Though an unincorporated bank was a joint-stock company, as contended, the stockholders constituted a "partnership," under the law of Texas.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Partnership.]

11. Banks and banking ☞105(3)—Cashier has authority to bind bank in usual financial business.

By the common law, as well as the law of Texas, the cashier of a bank has apparent authority to bind the bank in its usual financial business.

12. Bankruptcy ☞140(3)—Bank not entitled to claim trust ex maleficio in property purchased with its funds.

Though the manager of a bank, clothed with full authority to manage its funds, became a trustee ex maleficio by using its funds in the purchase of property in his own name, the bank could not assert its claim to the prejudice of mortgagees and attaching creditors represented by the

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

trustee in bankruptcy, and who did not know that the bankrupt's money was used in the purchase of the property.

13. **Trusts ☜334—Funds not recoverable, unless held in trust, and not as debtor.**

It is essential to the recovery of trust funds that the property should be held in trust, and that the relation should not be simply that of debtor and creditor.

14. **Trusts ☜358(1)—Funds must be traced in order to be recovered.**

A cestui que trust, in order to recover trust funds, must trace his property or the proceeds thereof so far as it can be traced in its original form, or to other forms into which it has been converted.

15. **Chattel mortgages ☜16—Mortgage of building on leased land, which was subject to removal by lessee, properly recorded as chattel mortgage.**

A mill building, built on land leased from a railroad, with a provision that it could be moved off by the lessee, provided he performed all his obligations to the lessor, was personal property, and a chattel mortgage thereon filed in the chattel mortgage records of the county was good.

16. **Fixtures ☜7—Machinery attached to building itself personal property, not part of realty.**

Where a building erected on leased land was personal property, machinery did not become a part of the realty by being attached to the building.

17. **Fraudulent conveyances ☜203—Preferential mortgages good in hands of innocent purchasers.**

Though chattel mortgages would have been void as preferences in the hands of the mortgagee, they are good in the hands of innocent purchasers of the mortgages, and secured notes.

18. **Chattel mortgages ☜153—Mortgagee of quantity of wheat not entitled to participate as tenant in common with holders of earlier mortgages.**

Where the owner of a mill gave several mortgages on specified quantities of wheat in the bins of the mill, and on his bankruptcy there was insufficient wheat to satisfy all mortgages, a mortgagee was not entitled to participate as tenant in common with the holders of earlier mortgages, who had no notice of her unrecorded mortgage.

19. **Estoppel ☜68(2)—Mortgagee of wheat held to have waived right to participate with other mortgagees.**

Where a bankrupt had given a number of mortgages on specified quantities of wheat in the bins of a mill, and there was insufficient wheat to satisfy all the mortgages, a mortgagee, who contended that the mortgages took effect according to the time of filing, waived any right to prorate with any of the other mortgagees.

20. **Chattel mortgages ☜188(2)—Mortgage on wheat in bins of mill not void as "mortgage on goods exposed for sale."**

A mortgage on a quantity of wheat held in the bins of mill for manufacture into flour, etc., is not void, under Rev. St. Tex. art. 3970, as a mortgage on goods, wares, and merchandise exposed for sale.

21. **Chattel mortgages ☜47—Description of wheat in bins of milling company held sufficient.**

Under the maxim that that is certain which can be made certain, chattel mortgages describing the property as 3,000 bushels of wheat, or 3,000 bushels of No. 2 wheat, located in the bins of a milling company in a named town, *held* sufficient.

22. **Bankruptcy ☜151—Trustee held not to stand in position of innocent purchaser as against mortgagees.**

As against chattel mortgagees a trustee in bankruptcy does not stand in the position of an innocent purchaser for value, but in the position of a judgment creditor holding a lien on property in his custody, and of a creditor with an unsatisfied execution as to property not in his custody.

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

23. **Bankruptcy ⊕⇒311(3)—Transferees of preferential notes and mortgages not required to exhaust remedies against indorsee who received the preference.**

Where a bank in whose hands notes and chattel mortgages constituted preferences indorsed them to innocent purchasers, the transferees were not required, under the doctrine of marshaling of assets, to first exhaust their remedy against the bank on its indorsement before resorting to the mortgaged property, whether the bank was solvent or insolvent, as the trustee should collect the preference from the bank.

24. **Fraudulent conveyances ⊕⇒197—One to whom preferential mortgage pledged held innocent holder for value.**

One to whom a note and chattel mortgage constituting a preference was pledged for the payment of a direct obligation of the mortgagee who received the preference *held* an innocent holder for value.

25. **Chattel mortgages ⊕⇒124—Did not cover after-acquired property, unless so provided.**

Mortgages on specified quantities of wheat in the bins of a mill did not cover after-acquired property, unless they so provided.

26. **Bankruptcy ⊕⇒140(½)—Under mortgage of wheat mingled with other wheat, law presumes mortgagor used his own wheat.**

Where a miller, who later became bankrupt, gave mortgages on specified quantities of wheat in his bins, and added to and subtracted from the wheat in the bins after the mortgages were given, the law presumes that he ground his own wheat, and not that mortgaged.

27. **Chattel mortgages ⊕⇒168—Taking wheat from bins and replacing it held not conversion, where there was sufficient to satisfy mortgage.**

Where a miller gave mortgages on specified quantities of wheat in his bins, the taking of wheat from the bottom of the bins for grinding purposes, and replacing same by putting new wheat at the top of the bins, was not a conversion of the mortgaged property, so long as there was sufficient on hand at all times to satisfy the mortgages.

28. **Chattel mortgages ⊕⇒138(2)—Acceptance of new mortgage and note in satisfaction of old one held not to affect right of precedence over subsequent mortgagee with notice.**

Where the holder of the last of a number of mortgages on specified quantities of wheat in the bins of a mill had notice of the earlier mortgages, the acceptance by one of the earlier mortgagees of a new mortgage and note in satisfaction of the old one did not affect the right of her mortgage to precedence, though she made the renewal without the consent of the holder of the later mortgage.

29. **Bankruptcy ⊕⇒165(4)—Chattel mortgage renewed without knowledge of insolvency not preferential, though recorded after obtaining such knowledge.**

Where a mortgagee, at the time she took a new mortgage and note in satisfaction of the old one, had no reason to suspect the mortgagor's insolvency, the note was not a preference under the laws of Texas, though not filed for record until a few days before the mortgagor's bankruptcy, and after she had full knowledge of the mortgagor's insolvency.

30. **Bankruptcy ⊕⇒323—Mortgagee held entitled to apply proceeds on interest and attorney's fees, though this results in greater unsecured claim.**

Where the proceeds of mortgaged wheat are insufficient to pay the secured note, with interest and attorney's fees, the mortgagee is entitled to apply the proceeds to the payment of attorney's fees and interest, and apply the balance on the principal, and have the remainder of the principal allowed as an unsecured claim, though this has the effect of allowing interest on an unsecured claim after bankruptcy, but no interest can be allowed thereon after the date of the payment.

31. **Trusts ⊕⇒30½(1)—One conducting mill for erection of which others contributed money held a trustee.**

Where persons contributing money for the erection of a mill and intending to form a corporation failed to do so, and the mill was conducted

⊕⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

in the name of the proposed corporation by one of them who held the legal title, he held it in trust for the parties contributing the money as co-owners.

32. Corporations ⊗⇒28(3)—"De facto corporation" not formed by operating under corporate name after papers returned by secretary of state for irregularities.

Where persons contributing money for the erection of a mill, intending to form a corporation, prepared what they considered the necessary instruments to be filed in the office of the secretary of state, but they were returned by the secretary for irregularities, and the business was operated under the name selected for the corporation, there was no "de facto corporation," which is one actually organized, and the charter of which is filed, but contains some defect.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, De Facto Corporation.]

33. Bankruptcy ⊗⇒140(3)—Property held in trust vests in trustee, subject to liens and equities.

Property to which the bankrupt had title as trustee at the time of the bankruptcy vested in the trustee in bankruptcy, but came to him charged with all liens and equities against it in the hands of the bankrupt.

34. Bankruptcy ⊗⇒140(3)—Claims in connection with mill, to which bankrupt had title as trustee, must be filed.

Where a bankrupt had title to a mill as trustee for the persons furnishing money for its erection and intending, but failing, to form a corporation, such persons and creditors of the mill must file their claims subject to the same conditions as all other creditors of the estate.

35. Partnership ⊗⇒17—Persons assuming relationship constituting a partnership in law become partners, though not so intended.

Persons may assume a relationship in law constituting a partnership, though they had no intention of doing so, and, if they agree to assume a relationship which in law constitutes a partnership, they become partners in fact.

36. Bankruptcy ⊗⇒345—Claims for machinery for mill to be paid before claims of co-owners of the mill.

Where persons contributing money for the erection of a mill intended, but failed, to form a corporation, and the mill was conducted by the bankrupt who had the legal title, claims for machinery for the mill must be paid before anything can be paid the co-owners.

37. Bankruptcy ⊗⇒481—Officers held entitled to same commissions as if property administered had been part of general estate.

Where a mill to which the bankrupt had title as trustee for persons furnishing money for its erection was administered at the request of owners and mortgagees, the officers of the court are entitled to the same commissions as though it were a part of the general estate.

38. Chattel mortgages ⊗⇒157(2)—Mortgagee held to have burden of showing lack of notice of unrecorded renewal of earlier mortgage.

Under Rev. St. Tex. arts. 5654 and 5655, relative to the registration of chattel mortgages, where a mortgagee of wheat on December 4, 1918, took a new mortgage in satisfaction of an earlier mortgage, but did not file it for registration until January 25, 1919, one taking a mortgage on November 27, 1918, which was filed for registration on November 29, held to have the burden of showing that it did not have notice of the unrecorded mortgage.

39. Bankruptcy ⊗⇒188(1)—Balance of proceeds of mortgaged wheat held payable to general creditors, and not to mortgagees of other quantities of wheat.

Where the bankrupt had given four mortgages on 3,000 bushels of wheat each, in his bins, and did not have sufficient wheat to satisfy all the mortgages, but the proceeds of the wheat covered by the first two mortgages were more than sufficient to satisfy the debts secured thereby, the excess must go to unsecured creditors rather than the subsequent mort-

⊗⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

gagees, since the mortgages can be sustained only on the theory that the 3,000 bushels mortgaged was technically segregated from the larger mass.

In Bankruptcy. In the matter of Elijah F. Ballard, bankrupt. On review of an order of the referee. Order confirmed.

The opinion of E. M. Baker, Referee in Bankruptcy, was as follows:

Elijah F. Ballard was adjudged a voluntary bankrupt on the 4th day of February, 1919. At the first creditors' meeting W. J. Lawther was elected trustee, and qualified by giving the required bond. The following property vested in the trustee: A flour mill at Cedar Hill, Tex., and also a flour mill at Lancaster, Tex., both places in Dallas county, and for about five years just prior to bankruptcy Ballard had been the general manager of a private bank at Cedar Hill, called the Farmers' & Merchants' Bank of Cedar Hill. The capital of the bank was divided into 53 shares, of $100 each, 5 shares of which were held by Ballard, and he operated the bank under a contract with the other shareholders whereby he was to receive one-half the net profits of the bank. There also came into the possession of the trustee about 60 hogs at Cedar Hill, which were fed partly from the waste at the mill, and there were 8,349 bushels of wheat at the Cedar Hill mill, and some flour, all of which was converted into money. There was also some flour at the Lancaster mill, which was converted into money. The assets received by the trustee also consisted of some notes and accounts and two lots in Belmont addition to the city of Dallas, and some other small items of property.

The Farmers' & Merchants' Bank was placed in the hands of a receiver in the state court by its other shareholders, when it was learned that the assets of the bank had been largely dissipated, although it is admitted that the bank is perfectly solvent, so far as the liability of its shareholders and their financial responsibility is concerned. The disposition of practically every item of the estate is contested. By the testimony and pleadings filed in the matter, the following issues have been presented to me for decision:

(1) More than 2,500 bushels of wheat in the bins at Cedar Hill had been received from farmers in the community upon the following conditions: A farmer would bring several bushels of wheat to the mill, and same would be placed, with the farmer's consent, in the bins containing the wheat belonging to the mill, and he would receive from the mill an instrument of writing as follows:

"Cedar Hill, Texas, ———, 191—.

"Received of ——— bushels of wheat, for which he is to receive in exchange ——— pounds of flour, ——— pounds of bran, and ——— pounds of shorts."

The farmers depositing this wheat claim they never parted with title to same: that it was held by the mill owner as a bailment. The trustee and also the holders of mortgages on the wheat in the bins at Cedar Hill contend that the transaction between the farmers and the mill owners constituted a sale.

(2) The bankrupt claims 20 hogs as exempt, and also the house and lot listed in his schedules at 622 West Tenth street in the city of Dallas, and all household and kitchen furniture in said house, one Ford sedan, family library, one year's salary claimed to be due him by the Farmers' & Merchants' Bank, and one year's salary claimed to be due him from the Cedar Hill Milling Company. The bankrupt claims all of said property as exempt by virtue of the laws and Constitution of Texas. The trustee has either set aside or agreed to set aside as exempt the said home occupied by Ballard and his family, the 20 hogs, the automobile, the household and kitchen furniture, and the family library. As for the salary claimed by the bankrupt as being due him by the Cedar Hill Milling Company and also by the Farmers' & Merchants' Bank, the trustee is not making any claim to salary due the bankrupt by the Farmers' & Merchants' Bank, and has refused to allow any salary from the Cedar Hill Milling Company.

The Farmers' & Merchants' Bank has filed a petition claiming that Ballard, the bankrupt, during the time he was manager and cashier of the Farmers' & Merchants' Bank, appropriated for his own benefit large sums of money

belonging to said bank, alleging that he used more than $20,000 belonging to the bank in his milling business at Cedar Hill, and more than $20,000 belonging to the bank in his milling business at Lancaster, and in all that Ballard had appropriated about $70,000 of the bank's money, and in addition about $10,000 in government bonds belonging to patrons of the bank, and the bank asserts that about $2,000 of its money has gone into the purchase price of the home occupied by the bankrupt and his family, and out of the funds wrongfully appropriated from the bank he purchased the library and the hogs and the automobile claimed as exempt. The bank avers that all of said items have been paid for with the bank's money, and that the property is held in trust by Ballard for the bank, and that in equity the bank is the real owner of said property, and the bank asserts that the hogs have been converted into money by the trustee, and the money received from the sale of the hogs claimed as exempt by the bankrupt should be turned over to the bank.

(3) The mill building at Cedar Hill was built upon land leased by the bankrupt on the right of way of the Gulf, Colorado & Santa Fé Railway Company. The lease provided for a nominal rental of $5 per year, and provided that the building could be moved off by the lessee, provided he performed all his obligations to the lessor. A chattel mortgage securing $10,000, payable to J. R. Smith, was executed against the mill building and machinery therein, and filed in the chattel mortgage records of Dallas county, Tex. There was also a mortgage on the machinery in said building in favor of the Anglo-American Mill Company for about $800. This mortgage was also filed in the chattel mortgage records of Dallas county, Tex. It appearing to the trustee that there was no equity in said building and machinery, if said two mortgages were valid, it was agreed between the trustee and J. R. Smith that the building and machinery should be sold for $9,000, and that the claim of Smith should be referred to $8,000 of the proceeds of said sale, and in case it should be held that the prior mortgage of the Anglo-American Mill Company is invalid, then the lien of said Smith should be referred to the full amount received from the sale of said mill building and the machinery.

The trustee has attacked the mortgages of J. R. Smith and the Anglo-American Mill Company on the grounds: (a) That the mortgage claimed by Smith was a chattel mortgage, and filed for registration as a chattel mortgage, whereas the building had been annexed to the realty in such a manner as to make it a permanent accession to the freehold; and (b) that the machinery in the building had, with the consent of the mortgagee of the machinery, been annexed to the building in such a way as to make it a part of the freehold, and, because the mortgages of Smith and the Anglo-American Mill Company were not filed in the record of mortgages and trust deeds in Dallas county, that they were void as to the trustee. The Farmers' & Merchants' Bank claims that its money was used to pay for said mill and machinery in excess of $20,000, and therefore the proceeds of this mill belong to said bank, and that said mortgages, as to said bank's rights, are invalid.

(4) E. F. Ballard, the bankrupt, under the name of Cedar Hill Milling Company, executed a promissory note for $5,133.35, dated November 8, 1918, due 120 days after date, payable to the order of the Farmers' & Merchants' Bank of Cedar Hill, said note providing for 10 per cent. attorney's fee on the principal and interest, if placed in the hands of an attorney for collection, and gave a chattel mortgage to said bank on 3,000 bushels of wheat located in the bins at the Cedar Hill Milling Company, the grain being described in the mortgage as "3,000 bushels of wheat stored in bins belonging to the Cedar Hill Milling Company, located on the right of way of the Gulf, Colorado & Santa Fé Railway, in Cedar Hill, Texas." This note was indorsed by the Farmers' & Merchants' Bank and sold to Dallas County State Bank on November 9, 1918, and on said last-mentioned date the mortgage was filed for registration in the office of the county clerk in Dallas county, Tex.

On November 16, 1918, the bankrupt executed a note in the sum of $5,000, payable to the order of K. L. White on February 15, 1919, bearing interest at the rate of 10 per cent. per annum from date until paid, and also providing for 10 per cent. attorney's fees upon the principal and interest then due, if placed in the hands of an attorney for collection. This note was secured by

a chattel mortgage on 3,000 bushels of wheat in the bins at Cedar Hill, described in said mortgage as follows: "3,000 bushels of No. 2 wheat in bulk. It is hereby agreed to keep insured in some solvent insurance company the above property, loss payable to K. L. White, cashier, and to deliver the policies to K. L. White, cashier. The above-described property is located in the bins of the Cedar Hill Milling Company, in the town of Cedar Hill, in Dallas County, Tex." And then follows a warranty as to the mortgagor having perfect title, free of liens. This mortgage was filed for registration in the office of the county clerk of Dallas county, Tex., on November 19, 1918.

On August 4, 1918, the bankrupt executed a note for $5,000, payable to the order of Wallace B. Smith on December 4, 1918, and secured same with a chattel mortgage on 3,000 bushels of wheat in the bins at Cedar Hill, Tex., and on December 4th, when said note became due, Wallace B. Smith having died, his wife as community survivor renewed said note and mortgage in her name as payee and beneficiary, upon the execution and delivery by the bankrupt of a new note and mortgage on 3,000 bushels of wheat. The first mortgage was never filed for registration, and was delivered to the bankrupt upon the execution of the new mortgage, and the new mortgage was not filed for registration until January 25, 1919, after the bankrupt had been compelled to close his business, and it was well known by Mrs. Smith that he was insolvent. The mortgage to Mrs. Smith, dated December 4, 1918, describes the property as "3,000 bushels of No. 2 wheat stored in steel tanks at the milling plant of the Cedar Hill Milling Company, Cedar Hill, Tex." The bankrupt placed the name of the Farmers' & Merchants' Bank on the back of this note as guarantor.

By note dated November 20, 1918, the Cedar Hill Milling Company promised to pay to the Farmers' & Merchants' Bank of Cedar Hill $5,000, with 10 per cent. interest per annum from maturity until paid, the note being due four months after date, and same was secured by a chattel mortgage in favor of Farmers' & Merchants' Bank on "3,000 bushels of No. 2 wheat situated in the steel bins of the Cedar Hill Milling Company on the right of way of the Gulf, Colorado & Santa Fé Railway." Ballard, as cashier of the Farmers' & Merchants' Bank, attempted to sell this note to the Oak Cliff State Bank & Trust Company. The latter declined to purchase this note, but stated to Ballard that it would accept the note of the Farmers' & Merchants' Bank, payable to the Oak Cliff State Bank & Trust Company, and would take the said mortgage and note as collateral. This transaction was closed on November 27, 1918, and the chattel mortgage filed for registration in the office of the county clerk of Dallas County, Texas, on November 29, 1918.

Before the loan transaction with the Oak Cliff State Bank & Trust Company was consummated, it required from Ballard a statement showing the financial condition of the Cedar Hill Milling Company, and this statement, which is incorporated in the testimony, was dated November 23, 1918, and among other things shows: "Money borrowed, secured by 8,500 bushels of wheat, $14,000." Said statement shows the total of wheat in the bins to be 13,210 bushels, and on the margin of this statement 13,210 is written in lead pencil figures, and just under same is placed 8,500, and a subtraction is made, showing the difference to be 4,710. It was testified by H. C. Barnard, vice president of the Oak Cliff State Bank & Trust Company, who handled the transaction, that he made these figures, and that his purpose in doing so was to determine just how many bushels of wheat the milling company had on hand not mortgaged. Thus the testimony shows that the Oak Cliff State Bank & Trust Company, when it accepted this mortgage as collateral, had full notice that mortgages on 8,500 bushels of wheat were outstanding, and while the testimony does not disclose whether or not the bank learned just who held these mortgages, yet there is no evidence that any wheat mortgages were ever given to any other parties than those above mentioned. Thus I find as a matter of fact that the Oak Cliff State Bank had notice of the old mortgage to Wallace B. Smith to the extent of 2,500 bushels of wheat.

Inasmuch as there were less than 8,500 bushels on hand at the time of bankruptcy the mistake of Ballard in reciting that only 8,500 bushels were mortgaged, instead of 9,000 bushels, is immaterial. All of this wheat, prior to bankruptcy, went into the hands of a receiver in the state court, and was

so held at the inception of bankruptcy, and prior to such receivership it was held by John F. Murphy as trustee under an assignment from the bankrupt; the assignment being made by Ballard under the state law·for the benefit of his creditors. The questions raised in reference to these wheat mortgages are:

(a) By the Farmers' & Merchants' Bank, that its money was used to purchase all the wheat, and that the wheat or the proceeds of the sale thereof belong to it.

(b) The trustee in bankruptcy contends that the mortgages held by the Dallas County State Bank and the Oak Cliff State Bank & Trust Company, both of them being originally made to the Farmers' & Merchants' Bank, are preferences, it being admitted that they were given to the Farmers' & Merchants' Bank for past-due indebtedness, and therefore void as to the trustee, and that the purchaser in the case of the Dallas County State Bank, and the pledgee in the case of the Oak Cliff State Bank & Trust Company, obtained no better title than the Farmers' & Merchants' Bank had to the mortgages.

(c) That the description in the mortgages was insufficient.

(d) That the mortgages were on a stock of goods exposed for sale, inasmuch as wheat was ground daily from the bins and the stock was being replenished from time to time, and therefore the mortgages under the state law are void as to creditors.

The last two objections were urged against all the mortgagees.

(e) It was also objected by the trustee, inasmuch as the mortgages did not cover after-acquired property, and as the wheat, when ground, was taken from the bottom of the bins, and when the stock was replenished the new wheat was placed in the top of the bins, that the amount which was ground subsequent to the time when the mortgages were placed on the wheat should be deducted from the amount mortgaged, and the after-acquired wheat, inasmuch as it went on the top of the bins, should be held not covered by the mortgages.

(f) Another reason urged by the trustee why the mortgages were void is because there was no No. 2 wheat in the bins which came into the hands of the trustee.

(g) It has also been urged by the trustee and by some of the unsecured creditors that inasmuch as the Farmers' & Merchants' Bank is a solvent indorser, with recourse on the notes held by the Dallas County State Bank and the Oak Cliff State Bank & Trust Company, that under the doctrine of "marshaling of assets" the holders of these mortgages should be required to collect from the Farmers' & Merchants' Bank, and leave the proceeds of the wheat for the unsecured creditors of the bankrupt, as the debts due the latter will otherwise be lost.

The testimony shows that there were three steel tanks or bins for storage of wheat at the plant of the Cedar Hill Milling Company. The capacity of bin No. 1 was 7,539 bushels, and of bins Nos. 2 and 3, 3,017 bushels each. On the 1st day of November, 1918, there was a total of 9,991 bushels of wheat in the bins, 1,245 bushels of wheat were received during the month of November, and 1,500 bushels were ground into flour during said month. There was on hand on December 1, 1918, 9,736 bushels. During the month of December, 1918, 585 bushels of wheat were received, and 2,000 bushels were ground into flour, leaving on hand the 1st day of January, 1919, 8,321 bushels. During the month of January, 1919, 835 bushels of wheat were received and 800 bushels were ground into flour. Thus it is seen that about 4,300 bushels of wheat were ground subsequent to November 1st, and the trustee contends that it was the understanding between Ballard and the mortgagees that he should not only retain the mortgaged property in his possession, but that he should have the right to grind the wheat into flour and sell the same, with no liability for accounting for the proceeds of the sale to the mortgagees, and that each of the mortgagees and those who subsequently·acquired the mortgages knew, at the time they took the respective mortgages and advanced their money, that the Cedar Hill Milling Company was engaged in the flour mill business, and that in the conduct of its business and in the course of

trade the company was purchasing wheat and grinding same into flour and selling same. The testimony is to the effect that White & Co. and Mrs. Wallace B. Smith did not know the mortgaged wheat or other wheat mixed therewith was being ground. It appears that the Dallas County State Bank and the Oak Cliff State Bank did know that Ballard was grinding from the bins in which was placed the wheat covered by their mortgages, but there is nothing in the testimony to indicate that any of the mortgagees ever agreed that Ballard should grind the wheat covered by any of the mortgages.

The Farmers' & Merchants' Bank claims that, when Ballard assigned the notes and mortgages to the Dallas County State Bank and the Oak Cliff State Bank & Trust Company, respectively, both of said notes and mortgages being payable to the Farmers' & Merchants' Bank, that said parties knew that Ballard was obtaining the money for his own use, and that said banks did not acquire good title to the bank's property. The testimony does not support this conclusion, as the money was deposited to the credit of the Farmers' & Merchants' Bank in every case, and was drawn out by checks of the Farmers' & Merchants' Bank, signed by Ballard as cashier. In the brief filed on the 20th day of September, 1919, for the Farmers' & Merchants' Bank of Cedar Hill in opposition to these mortgages, it is claimed that the mortgages held by the Dallas County State Bank and Oak Cliff State Bank & Trust Company are void, because Ballard was insolvent at the time said mortgages were executed, and he knew he was insolvent, and, as he was cashier of the Farmers' & Merchants' Bank, his knowledge was that of the bank, and through him the bank knew he was insolvent; that the enforcement of said mortgages in favor of the Farmers' & Merchants' Bank would have the effect of giving said bank a preference.

(5) It is contended that the mortgage in favor of Mrs. Wallace B. Smith, if valid for other reasons, would be a preference, because it was not filed for record until January 25, 1919, on which date Ballard was notoriously insolvent.

L. R. Roberts, acting for the Farmers' & Merchants' Bank of Cedar Hill, has filed a claim for the $5,000 note pledged with the Oak Cliff State Bank & Trust Company above mentioned. L. R. Roberts, acting for the Farmers' & Merchants' Bank and as one of the stockholders thereof, has filed a claim for the proceeds of the note for $5,133.35, secured by a chattel mortgage and transferred by the bank to the Dallas County State Bank, as above set out.

M. O. Durrett, receiver of the Farmers' & Merchants' Bank, has also filed a claim for the proceeds of the $5,000 note secured by chattel mortgage and pledged to the Oak Cliff State Bank & Trust Company, as above set out. M. O. Durrett, receiver of the Farmers' & Merchants' Bank, has also filed a claim for the note in the sum of $5,133.35, secured by chattel mortgage and assigned to the Dallas County State Bank, as above set out.

(6) The mill at Lancaster has been sold, by agreement of all the parties having prospective interests therein, for the sum of $11,000, and there was some flour, flour bags, and other incidentals on hand at the Lancaster mill, which were sold by the trustee for $564.85, making the total in the hands of the trustee, as proceeds of the sale of the Lancaster mill, $11,564.85.

The testimony shows that an affidavit under date of January 17, 1919, was prepared and sent to the secretary of state at Austin, together with an application for a charter. The charter was never filed, but was returned by the secretary of state because of certain irregularities. In the testimony of E. F. Ballard, given on the 17th day of February, 1919, he stated that he placed in the Lancaster mill $5,200, and that in addition $2,500 was borrowed from Mrs. Wallace B. Smith and used in connection with this mill. T. H. Ground paid $500 in Liberty Bonds, which were taken as cash, there being five bonds, of the par value of $100 each. P. W. Trees paid in $650 in Liberty Bonds, which were accepted as cash. W. R. Munden paid $2,000 in cash. S. W. Munden paid $1,000 in cash. J. C. Porter paid $200 in Liberty Bonds, which were accepted as cash. One thousand dollars of money belonging to Mrs. Mattie Hartsfield was placed in this mill; Ballard stating that he had on hand $1,500 of her money, and that $500 of her money he used for himself in this enterprise, and $1,000 of her money he used in the Lancaster mill, in-

tending to give her $1,000 of stock in the corporation, which sums make a total of $10,550, which Ballard testified was used in the construction of the Lancaster mill, in addition to the sums represented by two chattel mortgages on the machinery—one in favor of the Anglo-American Mill Company, and the other in favor of Fairbanks-Morse Company; claims in both of the latter cases having been filed. For reasons hereinafter stated, I find that as a matter of fact the proceeds of the sale of the Lancaster mill, after all debts are paid, should be divided as follows:

| | |
|---|---|
| W. J. Lawther, trustee of the estate of Elijah F. Ballard, bankrupt | 104/211 |
| P. W. Trees | 13/211 |
| W. R. Munden | 40/211 |
| S. W. Munden | 20/211 |
| J. C. Porter | 4/211 |
| Mrs. Mattie Hartsfield | 20/211 |
| T. H. Ground | 10/211 |

It was stated in the testimony that Turner Ballard and Mrs. E. F. Ballard were to have a part of the stock in said mill. However, I find as a matter of fact that neither Turner Ballard nor Mrs. E. F. Ballard ever contributed anything to the funds used in the construction and operation of the Lancaster mill, or for use in connection therewith.

The chattel mortgages have been attacked on the ground that the machinery, with the consent and knowledge of the mortgagees, became attached to the realty, and the mortgages are invalid as to the trustee, because they were not filed as mortgages on real estate; and the mortgage in favor of Fairbanks, Morse & Co. was attacked on other grounds namely, that it was not registered in a book marked "Chattel Mortgages on Machinery Attached to Real Estate" and because the mortgage filed was only a copy of the mortgage, and was not properly acknowledged as provided by statutes of Texas in case a copy of a mortgage is filed, instead of the original. A deputy county clerk testified that the county clerk had never opened a book for chattel mortgages on machinery attached to real estate, as provided by the law of 1917 to this effect. Revised Statutes of Texas, art. 5661, as amended by Act approved March 30, 1917 (Laws 1917, c. 153 [Vernon's Ann. Civ. St. Supp. 1918, art. 5661]). Said statute provides that such mortgages shall have indorsed on the back thereof, before filing, "Liens on Machinery Situated on Realty," neither of these mortgages had such indorsement made thereon, and for this reason the trustee contends that, even though the proper book had been opened and kept by the county clerk, the failure to make this indorsement was such error on the part of the mortgagees as to make the mortgages invalid as to the trustee.

The Farmers' & Merchants' Bank also claims the proceeds of the sale of this mill on the ground that its money was used in the purchase thereof. The land on which the mill was situated was purchased by the bankrupt, and title taken in his name, and the mill stood in his name at the time of bankruptcy. The trustee claims that for this reason the title to the property vested in the trustee absolutely for the benefit of creditors.

Mrs. Wallace B. Smith has filed her claim for $2,500, evidenced by note of the E. F. Ballard Milling Company, this being the name under which the mill at Lancaster was operated. S. W. Munden, W. R. Munden, and P. W. Trees have filed an application for their pro rata part of the proceeds of this mill. T. Soper has filed a claim for wheat furnished this mill, and I find as a matter of fact the flour on hand at the time of bankruptcy in this mill was the product of wheat furnished by said T. Soper. There may be other claims against the Lancaster mill.

### Conclusions of Law by the Referee.

[1] The sole question in reference to the deposits of the farmers, as I view it, is: Did the transaction constitute a bailment or a sale? The testimony of some of the farmers is to the effect that they would have obtained all the flour to which they were entitled long before bankruptcy, had it not been for the existence of a rule of the United States Food Administration which prohibited a mill from making a contract to deliver flour to an amount greater

than the actual requirements of a family for more than 30 days during a part of the time after the wheat was delivered, and for part of the time the rule was for the supply not to exceed 60 days requirements of a family. These rules and regulations were made by authority of acts of Congress, and all provide a penalty or jail sentence, or both, for any violation thereof. Sections 10185, 10186, 10187 et seq., Barnes' Fed. Code 1919 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅛a–3115⅛cc, 3115⅛e–3115⅛g).

There is nothing in the certificate given by the mill owner which states when the depositors are to receive flour, bran, and shorts "in exchange" for the wheat delivered; thus it would be presumed that all parties knew the law and expected to conform thereto, and that they could receive their flour only in accordance with the United States Food Regulations. Therefore I do not consider that these regulations have any material bearing upon the rights of the parties.

[2] Some testimony was introduced as to what the farmers intended by this transaction, and the question was also asked the mill owner, if the farmers had demanded back their deposits of wheat, would their demands have been complied with. All of this character of testimony was objected to upon the ground that the written receipts for the wheat fully expressed the contract between the parties, and that this contract could not be varied by parol testimony. While I admitted the testimony for the consideration of the judge in case the matter should be taken up to him, yet I do not consider that the testimony is admissible because the contract is plain, and "it is a cardinal rule in the interpretation of contracts that, if the words or terms thereof are equivocal, the subsequent acts of the parties thereunder are admitted to show how the parties understood their contract, and such acts are a practical construction of it; * * * however, where the contract is free from ambiguity, and its meaning is clear in the eye of the law, such mode of construction is inadmissible." L. C. Smith & Bro. Typewriter Co. v. Alleman, 199 Fed. 1, 117 C. C. A. 577; 1 Black on Contracts, §§ 721, 722, pages 875–877.

[3, 4] As to whether the farmers, had they demanded a return of their wheat, would have received same, has no bearing upon the contract; the question is whether under the law they could have compelled the receiver of their wheat to have returned the same. There is no federal question involved in this case; therefore the law of Texas is controlling. But counsel for the various parties having interest in this matter have cited no Texas cases in point, nor even analogous, and I have been able to find no such decision by Texas courts. In the absence of a decision of the highest court of the state as to the validity of a lien, the court of bankruptcy would be governed by the decisions of the United States courts. In re R. M. Davis (D. C. Tenn., March, 1919) 256 Fed. 52, 43 Am. Bankr. Rep. 458. I have found no decisions in point by the United States District Court for this district, nor by the United States Circuit Court of Appeals for this district.

[5] As hereinafter set out it seems to me that the decisions of the United States Supreme Court are to the effect that the deposits of wheat by the farmers in this case should be held to be a sale or exchange in which title passed to their deposits of wheat, and there is reason to believe that this would be the holding of the Texas courts. The only case along this line is that of First State Bank v. Barnett, 48 Tex. Civ. App. 82, 106 S. W. 183. In this case cotton seed belonging to a producer had been mixed by a ginner with the owner's consent with that belonging to the ginner when the cotton was ginned; it being agreed that 64 pounds of seed should be delivered to the producer for each 100 pounds of lint cotton ginned. The ginner mortgaged all his own seed and also that of the producer, but the court held that this was a bailment, and no title passed. This is the general rule in practically every state in the Union, and is an exception arising out of the custom of trade to the general proposition that, where one with whom goods are deposited is not bound to restore the specific goods, but has an option to return them in kind, the transaction is to be regarded as a sale, rather than as a bailment. This exception exists in the case of grain deposited in a warehouse or elevator, to be commingled with other grain there deposited. L. R. A. 1918F, 147, note.

The Texas court in this case cited Potter v. Roller Mill Company, 101 Mo.

App. 581, 73 S. W. 1005; and in the Missouri case, which is practically on all fours with our case, it was held the transaction was a sale. There were two questions in the Missouri case: The first was on the general proposition involved in the Texas case; and the second was the proposition involved in the instant case. Thus it cannot be known that the Texas court approved the second point, and it would have been immaterial, had they done so, as the facts of the Texas case called for no decision on this point. However, it is interesting to know that the court in the Texas case quoted from another case, as follows: "Can the depositor, by his contract, compel a delivery of wheat, whether the dealer is willing or not? If he can, the transaction is a bailment. If the dealer has the option to pay for it in money or other wheat, it is a sale." The Texas court also quotes with approval: "It is only when the bailor retains the right from the beginning to elect whether he will demand the redelivery of his property, or other of like quantity and grade, that the contract will be considered one of bailment. If he surrender to the other the right of election, it will be considered a sale."

Professor Simkins of the law department of the University of Texas, one of the most prolific and reliable legal writers our state has produced, in his work on Contracts and Sales, at page 809, says: "If the receiver of goods is to return another thing of value, and is not obliged to return the identical article in the same or some altered form, the transaction is a sale, and title is changed." In re Rabenau (D. C. W. D. Mo. Oct. 1902) 118 Fed. 471; Sturm v. Boker, 150 U. S. 312, 14 Sup. Ct. 99, 37 L. Ed. 1093; In re Martin-Vernon Music Co. (D. C.) 132 Fed. 985; Powder Company v. Burkhardt, 97 U. S. 119, 24 L. Ed. 973, and First State Bank v. Barnett, supra.

In the Rabenau Case, supra, cited by Professor Simkins, the court quoted the case of Chickering v. Bastress, 130 Ill. 206, 22 N. E. 542, 17 Am. St. Rep. 309, as follows: "When the identical thing delivered is to be restored, or in its altered form of money, the contract is one of bailment, and the title to the property is not changed; but when there is no obligation to restore the specific article, and the receiver is at liberty to return another thing of equal value, or the money value, he becomes a debtor to make a return, and the title to the property is changed. * * * It is a sale." See this case for other authorities quoted and discussed.

In the case of Sturm v. Boker, supra, the distinction between a sale and a bailment was laid down by Mr. Justice Jackson in practically the same words above quoted from the Rabenau Case. "The power to require the restoration of the subject of the agreement is an indelible incident of a contract of Bailment." In re Columbus Buggy Co., 143 Fed. 860, 74 C. C. A. 613. And "in a contract of sale there * * * must be an agreement, expressed or implied, to pay a purchase price." Union Stockyards, etc., v. Western Land Co., etc., 59 Fed. 53, 7 C. C. A. 665.

In the case of Pierce v. Schenck, 3 Hill (N. Y.) 28, logs were delivered to a mill to be sawed into boards, and the mill owner was to get one-half of the lumber for sawing; the court said this was a bailment, but, had the logs been taken with a promise to return boards generally of equal value to one-half the boards made from the logs deposited, it would have been a sale. See case cited therein; also Story on Bailments, § 439, etc.

In the case of Powder Co. v. Burkhardt, 97 U. S. 110, 24 L. Ed. 973, the court distinguished a bailment from a sale as follows: "Thus where logs are delivered to be sawed into boards, or leather to be made into shoes, rags into paper, olives into oil, grapes into wine, wheat into flour, if the product of the identical articles delivered is to be returned to the original owner in a new form, it is said to be a bailment, and the title never vests in the manufacturer. If, on the other hand, the manufacturer is not bound to return the same wheat or flour or paper, but may deliver any other of equal value, it is said to be a sale or a loan, and the title to the thing delivered vests in the manufacturer." See, also, Story on Bailments (9th Ed.) § 47; Schouler on Bailments (3d Ed.) § 6; Kent's Commentaries (14th Ed.) vol. 2, § 590; Beach, Modern Law of Contracts, vol. 1, § 746; Benjamin on Sales, vol. 1, p. 2; Lawson, Bailments, par. 8.

The only cases that I found to the contrary are Inglebright v. Hammond (1850) 19 Ohio, 337, 53 Am. Dec. 430, and Slaughter v. Green 1 Rand. (Va.) 3, 10 Am. Dec. 488; Cyc. vol. 35, p. 33. In a later Virginia case (Robert v. Clem, 86 Va. 379, 10 S. E. 506) it was held that, where it was uncertain whether delivery of wheat was bailment or sale, it was a question for the jury.

It seems to me that the decided weight of authority in the various state courts, and in the federal courts, is to the effect that the transaction in the instant case was one of sale or exchange, and that title passed. When the farmers delivered their wheat and accepted a certificate, which contained a promise to deliver them a certain number of pounds of flour, bran, or shorts for each bushel of wheat delivered, they parted with title to their wheat upon the instant of delivery, and their only recourse upon the mill owner from that time was a recovery of the amount of flour, bran, and shorts specified in their certificate, or damages for a failure to make such delivery. If, when the farmers left their wheat at the mill, they had received an obligation of the mill owner to redeliver to them an equal number of bushels of the same grade of wheat delivered, although the contents of the bins had changed several times, the depositors would still under the law have been entitled to the wheat delivered, had there been sufficient to satisfy their demands and the demands of other tenants in common; but when they agreed to accept for their wheat a certain number of pounds of flour, to be delivered upon demand, the mill owner became their debtor for the flour promised, and the depositors had parted with their right to compel a redelivery of their deposits. For the reasons stated, I have held that the various claimants of flour due them from the Cedar Hill Milling Company are general creditors of this estate, and that their various claims for flour as proven will be reduced to money at the price for which the flour on hand at the time of bankruptcy was sold by the trustee.

Some of these claims were based upon deliveries of wheat before the mill was burned in 1917. Inasmuch as I have held that all these transactions were such that title passed to the mill owner, it is unnecessary to distinguish between these claims, as all the claimants become general creditors. Had the transaction been a bailment, the depositors before the fire would have no claim whatever. The depositors have no right to claim the law is harsh, because most of the decided cases are on claims by depositors when a mill has burned and the mill owner was solvent. Under the law as stated, the loss in such a case falls on the mill owner.

[6-8] As to the issues raised in reference to the exemptions claimed by the bankrupt, it is my opinion that the bankrupt is entitled to all the exemptions claimed, except salary from the Cedar Hill Mill and the Farmers' & Merchants' Bank. I do not consider that it is necessary to discuss the issues in reference to any salary due him by the Farmers' & Merchants' Bank, as this is not a proper forum in which this question should be decided, and he is certainly not entitled to any salary from the Cedar Hill Milling Company, as this was his own business, operated under the trade-name of Cedar Hill Milling Company.

This is not the proper forum to decide whether the Farmers' & Merchants' Bank is entitled to the exemptions allowed the bankrupt under the law and constitution of the state of Texas. Under the Texas law (Rev. St. art. 3785) the bankrupt is entitled to his homestead, household and kitchen furniture, his library, and his automobile, and to 20 hogs; and the issue raised by the Farmers' & Merchants' Bank, that these properties were purchased with its funds, is a matter to be decided between the bankrupt and the Farmers' & Merchants' Bank in the state court. The trustee has sold the 20 hogs with the consent of the bankrupt and the trustee will be directed to hold the proceeds of the sale of the 20 hogs pending the outcome of any litigation between the Farmers' & Merchants' Bank and the bankrupt, or to place the same in the registry of the Court in which proceedings are begun.

In the case of Peyton v. Farmers' National Bank of Hillsboro, Tex., decided by our own Circuit Court of Appeals (C. C. A. 5th Circuit, November, 1919) 44 Am. Bankr. R. 295, 261 Fed. 326, it is held that "the jurisdiction of the bankruptcy court terminates, so far as exempt property is concerned, when the property claimed as exempt is set aside to the bankrupt, and, if an in-

dividual creditor contends that funds belonging to him went into the purchase price of the exempt property, he must assert his claim in the state court"— citing Lockwood v. Exchange Bank, 190 U. S. 294, 23 Sup. Ct. 751, 47 L. Ed. 1061, 10 Am. Bankr. Rep. 107, and Parlin & Orendorff Implement Co. v. Moulden (C. C. A. 5th Circuit) 35 Am. Bankr. R. 782, 228 Fed. 111, 142 C. C. A. 517, L. R. A. 1917B, 130.

[9, 10] As to the general proposition asserted by the Farmers' & Merchants' Bank, that it is entitled to the nonexempt property of the bankrupt as against the general creditors and also as against the holders of mortgages against the bankrupt's property, by reason of the fact that the bank's money was used in the purchase of such property, it is my opinion that the bank has failed to trace its funds into any specific property, and, even if it should be proven that the bank's money was used to purchase any specific property by Ballard, the bank could not assert its claim to the prejudice of the mortgage holders and attaching creditors; the latter being represented by the trustee in bankruptcy.

It is asserted in the pleadings filed by the bank that the bank was not a partnership, but a joint-stock company. This is immaterial, as Ballard was the sole manager of the bank, and, whether he acted as a partner or as manager, he was clothed by the stockholders of the bank with full authority to manage its funds. Even if the property mortgaged by Ballard had belonged to the bank, he could have mortgaged it, and the lienholders would not be prejudiced, even though the proceeds of the mortgage were not properly applied. Harris v. Donaldson, 20 Tex. Civ. App. 9, 48 S. W. 791; Caraway v. Citizens' National Bank (Tex. Civ. App.) 29 S. W. 507; Crozier v. Kirker, 4 Tex. 259, 51 Am. Dec. 724; Phillips v. Stanzell (Tex. Civ. App.) 28 S. W. 902.

It is contended by the bank that Ballard was not a stockholder, but there is no testimony to warrant any other conclusion than that he was a bona fide holder of $500 of the capital stock of the bank and that the bank was an ordinary partnership; and the shareholders evidently so considered it, as they published on the bank's stationery that the joint liability of the shareholders of the bank was several hundred thousand dollars, and even though the bank were a joint-stock company as contended, the stockholders constituted a partnership under the Texas law. Slaughter v. American Baptist Publishing Co., (Tex. Civ. App.) 150 S. W. 224.

[11] If we view the matter from another angle, the same conclusion is reached. It is a common-law rule, and also the Texas law, that the cashier of a bank has the apparent authority to bind the bank in the usual financial business of the bank. Reuter v. Nixon (Tex. Civ. App.) 206 S. W. 716; Houston National Exchange Bank v. Gregg County (Tex. Civ. App.) 202 S. W. 805; City National Bank v. Martin, 70 Tex. 643, 8 S. W. 509, 8 Am. St. Rep. 632; Bank v. Bank, 10 Wall. 604, 119 L. Ed. 1008; City Nat. Bank v. Martin, 70 Tex. 643, 8 S. W. 509, 8 Am. St. Rep. 632. In the last case cited the court said: "Having held him [the cashier] out to the world as worthy of confidence, it would be monstrous to allow it to profit by the frauds that he was thus enabled to perpetrate."

In Bank v. Sabin, 227 Fed. 581, 142 C. C. A. 211, there was a contest between a trustee in bankruptcy and a bank that had furnished money to the bankrupt to buy a stock of goods, under an agreement that he should take title as trustee for the bank in so far as was necessary to protect the bank, and pay back the money that he owed it. This was held to be in effect a chattel mortgage, and that, in determining the validity of chattel mortgages in bankruptcy proceedings, the federal court will follow the settled law of the state. The law of this state is that a creditor perfecting an attachment on property takes precedence over the holder of a chattel mortgage, if the mortgage is not filed for registration forthwith after same is executed. Barnett v. Squyres (Supreme Court of Texas) 93 Tex. 193, 54 S. W. 241, 77 Am. St. Rep. 854.

[12] The bank has contended that the bankrupt became a trustee ex maleficio under the law of Texas. Even though he had been a trustee by agreement, the bank's contention could not be upheld; much less so, if he were a trustee ex maleficio, as it could not be expected that those dealing with Ballard as creditors would have any more knowledge of his relation to the bank

than the shareholders themselves. It is not contended that any of the creditors had any notice that the bank furnished any money to purchase any of the property held by Ballard. On the other hand, it is admitted that none of the creditors had such knowledge, and that the stockholders of the bank themselves had no such knowledge. "Where loss is to fall upon one of two innocent parties, it is placed upon the one most in fault." Kesler v. Zimmerschitte, 1 Tex. 56; Lewis v. Durst, 10 Tex. 417. "He who trusts most must suffer most." Thus, even, if the equities were equal in this case, and they are more in favor of Ballard's creditors than the Farmers' & Merchants' Bank, the law would be against the bank so far as the general creditors and mortgage holders are concerned, as Ballard was a partner of the owners of the bank, and he was its sole manager, and the stockholders, during the whole five years of his management and control of the bank, never had the books audited nor even inspected.

[13, 14] The law regulating the recovery of trust funds is well settled: First, it must be determined whether the property was held in trust, or the relation simply of debtor and creditor existed. After it is determined that the trust relation existed, then one of the cardinal rules is that the cestui que trust must trace his property or the proceeds thereof so far as it can be traced in its original form, or to other forms into which it has been converted. "Where a trustee mingles trust funds and makes payments out of the common fund, there is a sufficient identification of the remainder not exceeding the smallest amount the fund contained subsequent to the commingling, because the legal presumption is that he regarded the law, and neither paid out nor invested in other securities or property the trust fund, but kept it sacred. Spokane County v. First National Bank of Spokane et al., 68 Fed. 979, 987, 16 C. C. A. 81; Empire State Surety Co. v. Carroll Co., 194 Fed. 593, 114 C. C. A. 435; In re T. A. McIntyre Co., 185 Fed. 97, 108 C. C. A. 543; In re First State Bank, 152 Iowa, 724, 133 N. W. 355. * * * And under such circumstances he is entitled to recover only the lowest balance" at any time "to the credit of the" one misapplying the trust fund. "The modern and more equitable doctrine permits the recovery of a trust fund from one not an innocent purchaser, and into any shape into which it may have been transmuted, provided he can establish the fact that it is his property, or the proceeds of his property, or that his property has gone into it and remains in a mass from which it cannot be distinguished, * * * and * * * only so long as the trust property can be traced and followed into other property, into which it has been converted, does it remain subject to the trust." Macy v. Roedenbeck (C. C. A. 8th Cir.) 36 Am. Bankr. R. 40, 227 Fed. 346, 142 C. C. A. 42, L. R. A. 1916C, 12.

In the case last cited the trust fund had been dissipated, and the court denied the cestui que trust any general lien for his trust fund, and allowed simply the amount of money that was traced and which remained on hand at the time of bankruptcy. See, also, Empire State Surety Co. v. Carroll, 194 Fed. 593, at page 604, 114 C. C. A. 435, at page 446. In the case of Zenor v. McFarlin (C. C. A 8th Cir.) 38 Am. Bankr. R. 510, 238 Fed. 721, 151 C. C. A. 571; the case of Macy v. Roedenbeck, supra, was followed, and the cases therein cited were discussed and approved.

For the reasons stated, I do not consider that the Farmers' & Merchants' Bank of Cedar Hill has any claim whatever against the estate of E. F. Ballard on the ground of misapplication of trust funds.

[15, 16] As to the issues raised under No. 3 of the statement of facts herein, it is my opinion that the mill building at Cedar Hill is personal property, and a chattel mortgage thereon filed in the chattel mortgage records of Dallas county, Tex., is good, and that, the building being personal property, there is no point to the contention that the machinery became attached to the building and therefore became a part of the realty. As a matter of fact, if the building and machinery did become a part of the realty, the trustee has no interest in the same, but they are the property of the Gulf, Colorado & Santa Fé Railway Company, upon whose land the building stands. Peyton v. Farmers' National Bank of Hillsboro, Texas (C. C. A. 5th Cir.) 44 Am. Bankr. Rep. 295, 261 Fed. 326, and cases therein cited; Wright v. Macdonnell, 88 Tex.

146, 30 S. W. 907; Armstrong v. Mission Independent School District (Tex. Civ. App.) 195 S. W. 895. From the decisions quoted I consider the lien of J. R. Smith on the building and machinery at Cedar Hill, Tex., and the Anglo-American Mill Company on the machinery valid, and that the mortgage of the Anglo-American Mill Company on the machinery has priority over the mortgage of J. R. Smith.

[17] My decision upon the statement of facts set out under paragraph 4 above, is that all the wheat mortgages are valid, and that the Dallas County State Bank and the Oak Cliff State Bank & Trust Company are innocent purchasers of the mortgages, so far as any preference is concerned; therefore, even if these mortgages would have been void as a preference, had they remained in the hands of the Farmers' & Merchants' Bank, they are good in the hands of said transferees, and that these mortgages should take effect as follows: The Dallas County State Bank has a mortgage on the proceeds of 3,000 bushels of wheat, White & Co. have a mortgage on 3,000 bushels of wheat, and Mrs. Wallace B. Smith has a mortgage upon the balance of the wheat, in addition to that covered by the two preceding mortgages, which balance was 2,349 bushels. This wheat has been reduced to money, and the proceeds received for same, less expenses, will be applied to the satisfaction of these mortgages, principal, interest. and attorney's fees, in case the attorney's fees were incurred before bankruptcy. There were 12,000 bushels of wheat mortgaged; but, as there was less than 9,000 bushels on hand at the time of bankruptcy, I am of the opinion that the Oak Cliff State Bank & Trust Company has no claim under its mortgage to any of the wheat that came into the hands of the trustee.

[18, 19] Mrs. Wallace B. Smith contends that, inasmuch as there is not sufficient wheat to satisfy all mortgages, the mortgagees are tenants in common as to the wheat on hand; that is, in case the wheat mortgaged was actually on hand at the time the mortgage was given. According to the testimony there was on hand at the time the mortgage was given to the Farmers' & Merchants' Bank, which the Oak Cliff State Bank & Trust Company acquired, 9,991 bushels. If the mortgagees became tenants in common, the relationship could be determined, however, I consider it unnecessary as to Mrs. Smith. in view of the fact that her mortgage was not recorded, and Dallas County State Bank and White & Co. had no notice of her mortgage, she has no right to take anything from them or to participate in the wheat mortgaged to them and the Oak Cliff State Bank & Trust Company has waived any right to prorate with any of the other mortgagees, as it has contended that the mortgages took effect according to the order filed, and that the first in time of filing is the first in right.

[20] I have failed to find any Texas case where raw materials held for manufacture, or wheat in bins, as in this case, constitute goods, wares, and merchandise exposed for sale in parcels, and thereby cause the mortgage on same to be void under Revised Statutes of Texas. art. 3970. On the other hand, I am of the opinion that the general tenor of Texas decisions on chattel mortgages is to the effect that such mortgages, when properly filed for registration, are good against an attaching creditor. Even were the mortgages on goods, wares, and merchandise exposed for sale, it might be that the mortgage would be good as between the parties, and the fact that the wheat had been literally taken possession of by the mortgagees through a receiver in the state court before bankruptcy might render the lien of the attaching creditor (the trustee in bankruptcy) inferior to that of the mortgagees. In the matter of Roseboom (D. C. N. Y.) 42 Am. Bankr. R. 437, 253 Fed. 136; Parker v. American Exchange National Bank of St. Louis (Tex. Civ. App.) 27 S. W. 1071.

In the case last cited the court said: "It may be questioned whether the property embraced in a mortgage, being five buggies, three surreys, one barouche, and three phaetons specifically described, would be considered * * * a stock of goods, wares and merchandise daily exposed for sale in parcels," notwithstanding they were a part of a stock of a retail merchant. The court said that the Texas statute making void "every mortgage, deed of trust or other form of lien attempted to be given by the owner of any stock

of goods, wares, or merchandise daily exposed for sale, in parcels, in the regular course of business of such merchandise, and contemplating a continuance of possession of such goods and control of said business, by sale of said goods by said owner" is simply "declaratory of a legal principle which had been decided in this state before the enactment of the statute." See Peiser v. Peticolas, 50 Tex. 638, 32 Am. Rep. 621.

[21] As to the objection that the description is insufficient to identify the property mortgaged, it is a maxim of the law that "that is certain which is capable of being made certain," and it has been held that a description, "30 bales of lint cotton, the first picking of our crop of 1882 to average 450 pounds each," is good. Senter v. Mitchell (C. C.) 16 Fed. 206. In the case of Person v. Wright, 35 Ark. 169, it is stated that, if the grower of cotton should give an interest in his whole crop to the extent of one 500-pound bale, then the mortgage would be void for uncertainty, and until the bale should be separated and identified no action of replevin could be maintained. The last-named case is in line with the contention by the trustee that the description is insufficient. However, the trustee's contention is not supported by Texas cases. Oxsheer v. Watt, 91 Tex. 124, 41 S. W. 466, 66 Am. St. Rep. 863; Avery v. Popper (Tex. Civ. App.) 45 S. W. 951; Id., 92 Tex. 337, 48 S. W. 572, 49 S. W. 219, 50 S. W. 122, 71 Am. St. Rep. 849; Id., 179 U. S. 305, 21 Sup. Ct. 94, 45 L. Ed. 203; Burlington State Bank v. Marlin National Bank (Tex. Civ. App.) 166 S. W. 499.

[22] As to whether an innocent purchaser for value would have taken good title to this wheat, or any portion thereof, is immaterial. The trustee of the bankrupt, in the absence of fraud, "takes the property * * * in the same plight and condition," and subject to the same liens and equities, as when the bankrupt held it. Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577; Zartman v. First National Bank, 216 U. S. 134, 30 Sup. Ct. 368, 54 L. Ed. 418. In the last-mentioned case the trustee contended that he took the same kind of title as a bona fide purchaser for value. The court said "The rule applicable to this and all similar cases is that the trustee takes the property of the bankrupt, not as an innocent purchaser, but as the debtor had it at the time of the petition [in bankruptcy], subject to all valid claims, liens, and equities; * * * the trustee is in no sense a bona fide purchaser for value, and [is not] entitled to protection as such." "The trustee is no more an innocent purchaser under the amendment of 1910 then he was before the amendment." Remington on Bankruptcy, (2d Ed.) § 1137. The test as to the trustee's rights in any case is not the position that an innocent purchaser for value would hold, but that of a judgment creditor under the state law holding a lien on the property in his custody and that of a creditor, with an execution returned unsatisfied as to all property not in his custody.

In this case the trustee occupies the position of a creditor who had fixed an attachment lien upon the property under the law of Texas. The bankrupt holding unregistered Liberty Bonds belonging to someone else, he could certainly pass good title to an innocent purchaser for value. But had the bonds been in the bankrupt's possession at the time of the bankruptcy, no one would contend that the trustee would take title to the bonds as against the rightful owner.

The trustee contends that the bankrupt gave a preference to the Farmers' & Merchants' Bank when he executed the two mortgages which are now held by the Dallas County State Bank and the Oak Cliff State Bank & Trust Company, and that the latter took no better title than the Farmers' & Merchants' Bank had. If the Farmers' & Merchants' Bank got a preference, the trustee should collect same from the Farmers' & Merchants' Bank. It is not contended for nor shown that either the Dallas County State Bank or Oak Cliff State Bank & Trust Company gained anything in taking these mortgages; the Dallas County State Bank gave full value, and the Oak Cliff State Bank & Trust Company gave full value. "The one thing absolutely essential to a preference is that the bankrupt transfer some portion of his property to the creditor. If the creditor receive none of the bankrupt's property, there is no preference." Mason v. National Herkimer County Bank (C. C. A. 2d Cir.), 22 Am. Bankr. R. 733, 172 Fed. 529, 97 C. C. A. 155; Aiello v. Crampton (C.

C. A. 8th Cir.) 29 Am. Bankr. R. 1, 201 Fed. 891, 120 C. C. A. 189; Catchings v. Chatham National Bank (C. C. A. 2d Cir.) 24 Am. Bankr. R. 843, 180 Fed. 103, 103 C. C. A. 601.

In the case of In re Wyly (D. C. Tex. 1902) 8 Am. Bankr. R. 604, 116 Fed. 38, decided by Judge Meek, it was admitted that a grocery company had received large payments from the bankrupts during their insolvency, and that, in the event the note in question had remained the property of the grocery company, it could not have been proved up by it without having first made a surrender of a preferential payment received, largely in excess of the face of the note. The note had been acquired by a bank in due course of the bank's business in discounting paper for its customers, and the evidence failed to disclose that the bank had knowledge of the insolvency of the bankrupt. The court said: "The rights of the purchaser or holder of a negotiable instrument, who has taken it bona fide, for a valuable consideration, in the ordinary course of business, before due, without notice are not affected by the equities existing between the antecedent parties."

[23] This settles the question, not only as to the rights of these two holders as innocent purchasers, but as to the contention of some of the creditors that, inasmuch as these banks had a solvent indorser on their note, the doctrine of marshaling of assets would compel these banks to first exhaust their remedy against the solvent indorser before taking the only security which the unsecured creditors have for the payment of their debts. Another answer to this latter contention is: Let the unsecured creditors, through their trustee, proceed to collect against the Farmers' & Merchants' Bank any claims which they have against said bank. The only basis upon which the doctrine of marshaling assets could rest in this case would be upon the assumption that the Farmers' & Merchants' Bank is a guilty party and should return to the Dallas County State Bank and the Oak Cliff State Bank & Trust Company the money received on these mortgages and then lose the mortgages given it by the bankrupt. The only theory upon which it should lose these mortgages is upon the ground of preference, and if a preference was received the trustee should proceed to collect same. It is averred that the bank is solvent, and, even if it were not solvent, this would not alter the circumstances. The trustee would certainly have as good a chance of collecting a judgment as the two banks now holding the chattel mortgages would have in collecting a judgment.

[24] The fact that the Oak Cliff State Bank & Trust Company holds its mortgage as a pledge for the payment of a direct obligation by the Farmers' & Merchants' Bank does not alter the applicability of the decisions above quoted in reference to an innocent holder for value. The holder of collateral or pledges to secure a debt is a bona fide holder. First National Bank v. Andrews (Tex. Civ. App.) 77 S. W. 956; Stone v. Brown, 54 Tex. 330; Anderson v. Waco State Bank, 92 Tex. 506, 49 S. W. 1030, 71 Am. St. Rep. 867; Randolph on Commercial Paper, § 794.

[25-27] The trustee raises the question that, inasmuch as the contents of the bins were added to and subtracted from after the mortgages were given, all the subtractions should be taken from the mortgaged wheat, and the additions could not be held by the mortgagees, as this would be a mortgage on after-acquired property. The mortgages did not cover after-acquired property, and it is a well-settled principle that a mortgage of this character does not cover after-acquired property, unless the mortgage so provides. There was less wheat in the bins at the time of bankruptcy than there had been at any time subsequent to the dates of the mortgages. Had the stock at any time subsequent to the dates of the mortgages fallen below the amount on hand at the time of bankruptcy, then the difference would not have been subject to any of these mortgages. The law presumes Ballard to have ground his own wheat, and not that mortgaged. Macy v Roedenbeck (C. C. A. 8th Cir.) 36 Am. Bankr. R. 39, 227 Fed. 346, 142 C. C. A. 42, L. R. A. 1916C, 12, and cases there cited. Taking the wheat from the bottom of the bins for grinding purposes, and replacing same by putting new wheat at the top of the bins, would not be a conversion of mortgaged property so long as there was sufficient on hand at all times to satisfy the mortgages. Central State Bank v. McFarland (C. C. A. 8th Cir.) 44 Am. Bankr. R. 5.

[28] On August 4, 1918, Wallace B. Smith lent Ballard $5,000, and took as security for the repayment thereof a mortgage on 3,000 bushels of wheat in the bins at Cedar Hill. This note matured on December 4th, at which time Wallace B. Smith had died, and his widow, Mrs. Wallace B. Smith renewed same by taking a new note for six months in the same sum and a new mortgage on 3,000 bushels of wheat. Mrs. Smith states that at the time she took the new mortgage she knew nothing about the other mortgages Mr. Ballard had made on the wheat, and nothing of Ballard's financial condition. This note was indorsed by the Farmers' & Merchants' Bank, which indorsement I do not consider material. Mrs. Smith testified that she did not require the indorsement of the Farmers' & Merchants' Bank; that the same was on the note when it was brought to her by Ballard. The old mortgage was never recorded, and the new mortgage was not recorded until January 25, 1919. Mrs. Smith states in her testimony, which is not contradicted, that the consideration for the new note was "in place of another note given to Mr. Smith four months before." And she further testified that nothing was ever paid on the first note, except the interest. at the time the new note was given and the old note and mortgage surrendered. She further stated that she asked Ballard why he did not extend the old note, and he said it would be more convenient to make a new one, and that he preferred this way to extending it, and that there was no other consideration for the new note, except the extension of the old note and mortgage.

It is my opinion that Mrs. Smith's mortgage takes precedence of that held by the Oak Cliff State Bank & Trust Company, because the bank had notice when it accepted the mortgage that 8,500 bushels of wheat were already mortgaged. See paragraph 4 above. The Oak Cliff State Bank & Trust Company, as is evident from the testimony, expected to have the benefit of a mortgage on only such wheat on hand in excess of 8,500 bushels. Mr. Barnard, vice president of the Oak Cliff State Bank & Trust Company, stated that he figured that the mortgage of the Oak Cliff State Bank & Trust Company was to cover 3,000 bushels of wheat that remained over the 8,500 bushels which were alleged in the statement furnished by Ballard to be already covered by mortgage.

Inasmuch as the Oak Cliff State Bank & Trust Company had notice of Mrs. Smith's old mortgage, the most pertinent inquiry is: What was the effect of the acceptance of the new mortgage and note in satisfaction of the old one by Mrs. Smith, in so far as this concerns the mortgage held by the Oak Cliff Bank? "The debt is the principal thing, and the mortgage is a mere incident. The first is the substance; the latter is a shadow." Jones on Mortgages (7th Ed.) § 927a; Mead v. York, 6 N. Y. 449, 57 Am. Dec. 469. The mortgage secures the debt and not the note. Willis v. Sanger, 15 Tex. Civ. App. 655, 40 S. W. 229, affirmed 93 Tex. 723, no opposition. In the last case cited a mortgage had been given for advances, and the old notes marked "Paid by new notes"; the same mortgage remaining in existence all the time. The court held, in the contest between the mortgagee and judgment creditors, whose lien took effect after the cancellation of the old note, that the lien continued until the debt was paid.

In the case of U. S. v. Crookshank, 1 Ed. Ch. (N. Y.) 233, a mortgage had been released, but the notes not paid: the release being given at the request of the mortgagor upon his expectation of selling his property and with the agreement that, in case the releases were filed for record, the mortgagee should be paid or other satisfactory mortgages given. The mortgagor died suddenly after the release was recorded and before a sale was made. The heirs gave a new mortgage deed, and the court held that, as between the deceased and his heirs and the mortgagees, an equitable lien remained on the property for the full amount of the debt, and a court of equity would have compelled the execution of the new mortgage deed according to the promises, when release was given. In Jones on Mortgages (7th Ed.) § 885, it is stated, "The right of subrogation is not lost by renewal of the mortgage." and citations are furnished under this paragraph wherein it is held that, even where a new mortgage is taken, which is void on account of usury, that the mortgagee would be equitably entitled to the same benefits that he would have

had without such renewal; that only the subsequent mortgage is regarded as void.

In the case of Clarkson v. Graham (1899) 21 Tex. Civ. App. 355, 52 S. W. 269, it was held that, where a mortgage is satisfied and released by a conveyance of the property and the conveyance is held void, the owner of the property and the rights of a new mortgagee, whose lien fails where a deed is set aside, will be subrogated to the lien of the old mortgage, as if the same were a valid lien. Suppose that the new mortgage of December 4th to Mrs. Smith was for some reason invalid, equity would subrogate her to her rights under the old mortgage, provided no rights of innocent third parties had intervened. Clarkson v. Graham, supra. Granting that the delivery up of the old mortgage and note was a release, and this would have been the effect of a return of the mortgage and note, had the note been paid, yet the consideration for the release was another mortgage on the same property. We will suppose that, instead of giving her a new mortgage and note, Ballard had simply promised to give a new mortgage and note, and had never done so, the old mortgage would still have remained in effect, and equity would have compelled Ballard to give a new mortgage, provided, of course, that the rights of innocent third parties had not intervened. U. S. v. Crookshank, supra.

The rights of the Oak Cliff Bank are not those of an intervening third party. Its rights on November 27th were inferior to those of Mrs. Smith; that is, it expected to get no lien on any wheat in the bins, except the wheat above 8 500 bushels. There were only 8,349 bushels in the bins at the time of bankruptcy.

The effect of a renewal by Mrs. Smith without the consent of the Oak Cliff Bank does not affect Mrs. Smith's priority. A first lienholder is under no obligation to consult an inferior lienholder upon her decision to renew the obligation. Kearby v. Hopkins, 14 Tex. Civ. App. 180, 36 S. W. 513, first column. In this case the court said: "The subsequent mortgagee is the master neither of the mortgagor nor prior mortgagee, nor has he such authority o · control over them, or either of them, that they needs must go to him and supplicate his consent to exercise their freedom of contract; and if, without his consent, they have exercised this freedom [of contract], it is none of his business, so long as he is uninjured by it."

Mrs. Smith, in taking the new mortgage in substitution and consideration of the old mortgage, left the Oak Cliff Bank just where it was when it closed the transaction with Ballard on November 27th, and I do not consider that she changed her position, either in law or in equity, by taking a new mortgage, and she will be allowed the proceeds of 2,349 bushels of wheat in satisfaction of her note, interest, and attorney's fees.

The mortgagees of all the wheat mortgages above mentioned had declared their notes due and placed them in the hands of an attorney for collection before bankruptcy; thus they will all be allowed attorney's fees as provided in their notes, and also interest on their notes to the date of payment, provided the wheat mortgaged is sufficient to cover same.

The Oak Cliff State Bank & Trust Company's claim will be allowed as an unsecured claim, with attorney's fees, and costs and interest to date of bankruptcy.

[29] The trustee has raised the point that, inasmuch as Mrs. Smith's mortgage was not filed for record until January 25, 1919, which was only a few days before bankruptcy, and after she had full knowledge of Ballard's insolvency, her mortgage should be regarded as a preference, as a preference is determined as of the time the chattel mortgage is recorded, and not as of the time it was made. This contention is the law in some jurisdictions, but it is not the law in Texas. The testimony is conclusive that Mrs. Smith had no reason to suspect the insolvency of Ballard on December 4th, when it was renewed. Thus the preference must be determined, not as of the time her mortgage was recorded, but as of the time it becomes effective between her and Ballard. Martin v. Commercial National Bank (C. C. A. 5th Cir.) 36 Am. Bankr. R. 25, 228 Fed. 651, 143 C. C. A. 173, affirmed (January, 1918) 245 U. S. 513, 38 Sup. Ct. 176, 62 L. Ed. 441, 40 Am. Bankr. R. 765; Bonner v. First National Bank, 41 Am. Bankr. R. 60, 248 Fed. 692, 160 C. C. A. 592;

Meyer Bros. Drug Co. v. Pipkin Drug Co. (C. C. A. 5th Cir.) 14 Am. Bankr. R. 477, 136 Fed. 396, 69 C. C. A. 240. It will be seen that all these cases cited are by our own Circuit Court, construing the law as to when Texas mortgages are preferences.

I find that attorney's fees had been incurred by the Dallas County State Bank, by the Oak Cliff State Bank & Trust Company, by White & Co., and by Mrs. Wallace B. Smith on the notes above mentioned, held by each of them before bankruptcy, and attorney's fees will be allowed on their respective notes.

The trustee received $2.47 per bushel for 1,037 bushels of the wheat sold, and $2.25 per bushel for 6,499 bushels. There were 813 bushels ground after bankruptcy by the receiver, and the flour sold in connection with some flour already on hand. Thus I consider that the 813 bushels ground should be valued at $2.47 per bushel making the total received for the 8,349 bushels on hand at bankruptcy the sum of $19,031.84. The expenses incurred in the sale of the wheat will be deducted; also the expenses of administration connected with handling the wheat will be deducted, and the claim of the Dallas County State Bank will be paid out of the proceeds of 3,000 bushels of wheat figured at an average price per bushel received for all the wheat, and the balance of the proceeds for such 3,000 bushels will go to the unsecured creditors. The same process of computation will be used in the payment of the mortgage held by White & Co., and the balance left will go to the unsecured creditors.

[30] The proceeds of the sale of the 2,349 bushels will be insufficient to pay in full the note of Mrs. Wallace B. Smith, principal, interest, and attorney's fees. She is entitled to have the proceeds of the mortgaged wheat first applied to the payment of attorney's fees, interest up to the date of such payment, and the balance applied on the principal, and whatever remains of the principal will be allowed as an unsecured claim; but no interest will be allowed on such unsecured claim after the payment is made out of the security. Ordinarily an unsecured claim does not bear interest after bankruptcy. Allowing the claim in this way will have the effect of the unsecured claim drawing interest after bankruptcy; however, this effect follows the general principle that the Bankruptcy Act provides that liens shall not be affected by bankruptcy, and therefore a mortgagee collects all interest upon his claim if the security is sufficient. Coder v. Arts (C. C. A. 8th Cir.) 18 Am. Bankr. R. 513, 152 Fed. 943, 82 C. C. A. 91, 15 L. R. A. (N. S.) 372, affirmed by U. S. Supreme Court 22 Am. Bankr. R. 1, 213 U. S. 223, 29 Sup. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008.

He may marshal the security against his interest and attorney's fees, which right is a part of the lien itself. "By the implied term of the agreement the creditor has the right, before he pays any of the face of the claim, to make certain deductions, among which is the deduction for interest accrued upon it. The balance is all that is applicable to payment." In re Kessler & Company (D. C. N. Y.) 22 Am. Bankr. R. 606, 171 Fed. 751. Thus it follows as a matter of law that, notwithstanding a larger unsecured claim is allowed than would be if interest were not charged after bankruptcy, yet, as a matter of fact, interest is paid in full out of the security, and the fund for unsecured creditors is not used to pay interest on the claim.

The costs incurred by the mortgagees in their suits in the state court will be allowed only as unsecured claims against the bankrupt's estate. The note pledged to the Oak Cliff State Bank & Trust Company, principal, interest, and attorney's fees, and costs incurred in the state court, will be allowed as an unsecured claim.

The claims filed by L. R. Roberts, covering the notes and mortgages held by Dallas County State Bank and Oak Cliff State Bank & Trust Company, respectively, will be disallowed and expunged from the record; also, the two claims filed by M. O. Durrett, receiver, covering the said two claims, notes and mortgages, will be disallowed and expunged from the record.

[31, 32] On the statement of facts set out in paragraph 6, I hold that the Lancaster mill was held in trust by Ballard for the parties who had contributed money for its erection; they being co-owners. It was the intention

of all parties that a corporation should be formed, and while they prepared what they considered were the necessary instruments to be filed in the office of the secretary of state, no corporation was formed. The business was operated under the name of E. F. Ballard Milling Company, which was the name selected for the corporation. However, this action of the parties did not create a de facto corporation. A de facto corporation is one actually organized and the charter filed, but having some defect; for example, if the law required two incorporators should be residents of the state, and as a matter of fact only one of the incorporators was a resident. American Salt Co. v. Heidenheimer, 80 Tex. 344, 15 S. W. 1038, 26 Am. St. Rep. 743; McLeary v. Dawson, 87 Tex. 524, 29 S. W. 1044.

[33, 34] Ballard held the title to all the property at the time of bankruptcy; thus the property vested in the trustee, but it came to the trustee charged with all the liens and equities that were against same in the hands of Ballard. However, the trustee cannot divest himself of this property to its owners and creditors, unless they prove their rights.

Some of the co-owners set out in the statement of facts have made application for their pro rata of the proceeds of said mill, after the payment of debts thereof; but others have not done so, and it may be that some of the creditors may not have filed their claims. Inasmuch as the title to this property was in E. F. Ballard and all parties dealing with the property were charged with notice to this effect, they are obliged to file their claims, subject to the same conditions as all other creditors of the estate.

It naturally follows that the various objections made by the trustee to the chattel mortgages on the machinery in the Lancaster mill have no effect in so far as they apply to the co-owners of the mill other than Ballard. However, in a sense this mill is an entity separate from Ballard's estate, and the only interest his estate has in same is his pro rata part of the equity remaining after all debts are paid.

[35] It has been alleged by some of those furnishing credit to this mill that it was in fact a partnership. I do not consider it necessary to so hold, however. It may possibly be a partnership. Persons may assume a relationship in law constituting a partnership, although they had no intention of doing so, and, if they do agree to assume such a relationship that the law constitutes a partnership, they become partners in fact. Freeman v. Huttig Sash Co., 105 Tex. 560, 153 S. W. 122, Ann. Cas. 1916E, 446. So far as the bankruptcy matter is concerned, it is sufficient to know that Ballard held the property in trust.

[36] Even if the mortgages were invalid, because they were not properly recorded, or because the machinery had become a fixture. it is admitted that the machinery has not been fully paid for; thus the claims are valid as unsecured claims, and these claims must be paid before the co-owners receive anything. The trustee contends that, inasmuch as Ballard held title to this property, those furnishing money that was used in the construction of the building and purchase of machinery are simply general creditors of the bankrupt's estate. The trustee is in no sense an innocent purchaser, and if property is in the hands of the bankrupt as bailee or agent, or is held in trust by him, the trustee in bankruptcy takes the property subject to these equities, and the bailor, principal, or cestui que trust can recover the proceeds or the property. Collier (11th Ed., 1917) p. 1121, and cases cited under notes 60 and 61; Security Warehouse Co. v. Hand, 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117, 11 Ann. Cas. 789, 19 Am. Bankr. R. 291. "The trustee in bankruptcy, as to real estate held by the bankrupt as a tenant in common, takes the interest of the bankrupt, not as an innocent purchaser, but in the same plight and condition as the bankrupt held it, and subject to all the equities that exist in favor of his cotenant." In re McConnell (D. C. N. Y.) 28 Am. Bankr. R. 659, 197 Fed. 438. "Where a person purchases property in his own name with the money of another, he holds such property in trust for the benefit of the real owner, and a trustee in bankruptcy, not having any greater title than the bankrupt himself, cannot claim such property so held in trust as a part of the bankrupt's estate." Jones, Trustee v. Dugan (1914) 38 Am. Bankr. R. 874, 124 Md. 346, 92 Atl. 775.

[37] After all the debts of the trust, partnership, or entity of the Lancaster mill, operated under the name of the E. F. Ballard Milling Company, are paid, the trustee should pay out the remainder in the proportions set out in paragraph 5 of the statement of facts. If attorney's fees were incurred on the obligations due by the E. F. Ballard Milling Company before bankruptcy, such attorney's fees should be paid, together with all commissions to which the officers of the court are entitled under the Bankruptcy Act, which I hold in this case to be the same as though the Lancaster mill were a part of the general estate, inasmuch as this property has been administered at the request of the owners and mortgagees.

The claim of the Farmers' & Merchants' Bank to any part of the Lancaster mill is denied, and all other claims asserted by the Farmers' & Merchants' Bank for the recovery of any part of this estate, on the ground that it was held in trust by the bankrupt, or that any equitable lien had been fixed thereon, will be denied, with the exception of the two lots in Belmont addition hereinabove mentioned, and no judgment will be rendered at this time adjudging who is entitled to the Belmont lots, or the proceeds thereof; but the Farmers & Merchants' Bank may file its petition in reclamation or otherwise for the recovery of said lots, or the proceeds thereof, and the matter will be acted upon after due notice.

[38] Since the foregoing opinion was filed, and prior to the date fixed for entering the order, Oak Cliff State Bank & Trust Company filed a motion to revise and set aside the findings as to the lien claimed by said bank on wheat. In said motion it is contended that, inasmuch as the mortgage of Mrs. Wallace Smith was not filed forthwith as required by law, it is absolutely void against the creditors of the mortgagor, and as against specific purchasers and mortgagees and lienholders in good faith, under Revised Statutes of Texas, arts. 5654 and 5655 (old numbers 3327 and 3328); the first-mentioned article being Acts of 1885, p. 76, and the second mentioned Acts of 1879, p. 134, § 1, amended Acts 1897, p. 209. The first article provides that reservations of title shall be held to be chattel mortgages when possession is delivered to the vendee, and be void as to creditors and bona fide purchasers, unless such reservations be in writing and registered as required of chattel mortgages. The second mentioned article provides that "every chattel mortgage, deed of trust, or other instrument of writing, intended to operate as a mortgage of or lien upon personal property, which shall not be accompanied by an immediate delivery and be followed by an actual and continued change of possession of the property mortgaged or pledged by such instrument, shall be absolutely void as against the creditors of the mortgagor or person making same, and as against subsequent purchasers and mortgagees or lienholders in good faith, unless such instrument, or a true copy thereof, shall be forthwith deposited with and filed in the office of the county clerk of the county where the property shall then be situated," etc.

The point urged by the Oak Cliff State Bank & Trust Company is that, inasmuch as Mrs. Smith's mortgage, although dated on December 4, 1918, was not filed for registration until January 25, 1919, which was after the insolvency of Ballard and she had full notice thereof, this mortgage is void as to the mortgage held by the Oak Cliff State Bank & Trust Company, which was dated November 27, 1918, and filed for registration on November 29, 1918. The provision of the statute making it necessary to file a chattel mortgage forthwith has nothing to do with a case of this kind, but with a case where a mortgage should be executed and an attachment levied at once, or another mortgage executed and filed, the second mortgagee having no notice of the first mortgage. Then the attachment lien or the second mortgage lien would take precedence over the first mortgage lien, if the first were not filed forthwith. But even though the attachment were levied before the first mortgage was filed, or the second mortgage was filed before the first, yet, if the first was filed forthwith, it would take precedence.

In the case of Moore et al. v. Masterson (1898) 19 Tex. Civ. App. 308, 46 S. W. 855, notes and a mortgage were executed on January 3, 1894. The mortgage was not deposited with the county clerk for registration until the afternoon of March 15, 1894. An attachment was levied several hours afterwards,

In order to have the chattel mortgage registered, the holder of same had to go to the house of the deputy county clerk, as he had closed the office for the day and had gone home. His time for closing the office was about 5 o'clock in the afternoon, and it was shortly after that hour that the mortgage was registered, the mortgagee evidently having learned of the insolvency of the mortgagor and was making desperate efforts to get his mortgage on record. The court said: "We are of the opinion that by the registration the mortgage lien of appellee was fixed before, and was superior to, the attachment lien of appellants." The appellants were in no wise placed in a worse position for the failure to register the mortgage. It was registered, and they had actual and constructive notice of it, before they became creditors within the purview of articles 3327 and 3328, Revised Statutes, 1895 (new numbers 5654 and 5655, Vernon's Sayles' Revised Statutes), the holding being that the articles in question are "applicable to those creditors only who have acquired some kind of a lien." Several cases cited, 19 Tex. Civ. App. of page 510, 46 S. W. near bottom of page 855, second column: "The mortgage was good as between the parties to it, although not registered, and when it was registered it was good as to all creditors who might acquire liens thereafter. The object of the statute is to give such notice that creditors will not be misled in incurring expense in attaching or obtaining other liens on the mortgaged property. The registration of the mortgage was as effective, under the circumstances of this case, as though it had been filed for registration within a few moments of its execution."

In support of his contention, the attorney for the Oak Cliff State Bank & Trust Company has cited the case of Brothers v. Mundell, 60 Tex. 240. In this case, the court says, on page 246, as to the chattel mortgage being "absolutely void as against the creditors of the mortgagor, and as against subsequent purchasers and mortgagees in good faith," unless the mortgage is recorded forthwith, that in the chattel mortgage act the Legislature has shown its intention that good faith shall be required only by purchasers, mortgagees, etc., of the original mortgagor; but in the case of creditors the instrument shall be absolutely void as to them, no matter whether they acted in good faith or not in crediting the mortgagee, or in seeking to enforce their debts against the mortgaged property. The court further said: "This intention is evidenced by the change of expression and punctuation so clearly that it is not necessary to comment upon it. Besides, the first section of the act is almost in the exact language of similar statutes in many other states, such, for instance, as New York, New Jersey, Ohio, Michigan, Nebraska, Minnesota, and others; and in all these states whenever the point has come under discussion, it has always been held that good faith was not required of creditors in order to enable them to avoid a chattel mortgage, not filed and deposited as required by the act. Farmers' Loan & Trust Company v. Hendrickson, 25 Barb. 484; Sayre v. Hewes, 32 N. J. Eq. 652–656; People v. Bristol, 35 Mich. 32; Braley v. Byrnes, 25 Minn. 297."

The bank also cites Burlington State Bank v. Marlin National Bank (Tex. Civ. App.) 166 S. W. 499. The question in this case concerns what constitutes subsequent purchasers and mortgagees or lien holders in good faith. The court said, quoting from Words and Phrases, pp. 3117–3119: "Good faith consists in an honest intention to abstain from taking an unconscientious advantage of another, even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious." "Good faith in general means without notice, as well as for a valuable consideration." "No one can become a purchaser or a bona fide incumbrancer of property in good faith, if he have notice of a pre-existing mortgage, although such mortgage may not be verified or recorded in accordance with the statute."

There is a distinction between a bona fide purchaser for value and a mortgagee in good faith without notice, on the one hand, and a lien creditor, on the other hand. In the case of Oak Cliff College for Young Ladies v. Armstrong (Tex. Civ. App.) 50 S. W. 610, the court said: Under the Revised Statutes above mentioned "a person is not a creditor whose claim is not a specific lien upon the property." On page 613, first column: "Such un-

recorded mortgage is absolutely void as to creditors; but, as to specific purchasers and mortgagees or lienholders, they must have become such in good faith, in order that the unrecorded mortgage shall be held void. A clear distinction is drawn between the two classes by the statute. It does not make the requirement as to good faith as to creditors in order that the unregistered mortgage become void; but it does make such requirement of subsequent purchasers, mortgagees, etc. * * * This construction of the statute was given by the Supreme Court in Brothers v. Mundell, 60 Tex. 246, and has been followed since in Keller v. Smalley, 63 Tex. 519; Avestreet v. Manning, 67 Tex. 663. 4 S. W. 248; Berkey & Gay Furniture Company v. Sherman Hotel Company, 81 Tex. 141, 16 S. W. 807; Bowen v. Wagon Works, 91 Tex. 385, 43 S. W. 872. The term 'creditors,' as used in the statute, has been construed in quite a number of cases, and its meaning is thus defined in Bowen v. Wagon Works, 91 Tex. 385, 43 S. W. 875." Continuing further, the court said: " 'The logic of [this] would seem to include within the term "creditors" all persons whose claims are, upon certain conditions, charged by law as specific liens upon certain property, such as holders of attachment, execution, judgment, landlord, and mechanic's liens, and to exclude therefrom all others.' Appellants' rights cannot therefore, arise under the provision of the statute relating to creditors, but must come under the second class, of which good faith is required. Good faith must be shown in order to give them preference to the unregistered mortgage."

As against one holding under an unrecorded deed, the holder of a mortgage dated subsequent to that of the deed has the burden of proving that he has had no notice of the deed, and that his mortgage is for a valuable consideration, while a creditor who had established a lien against the grantor by process of law prevails, unless notice of the unrecorded deed is shown. Under the Texas statute (article 6824, Vernon's Sayles' Revised Statutes), as considered by the Supreme Court of Texas, the lien of a judgment creditor is of higher standing than that of a mortgagee. Turner v. Cochran, 94 Tex. 480. 61 S. W. 923; Barnett v. Squyres, 93 Tex. 193, 54 S. W. 241, 77 Am. St. Rep. 854. Thus, according to the Texas law, I think that the burden of proof would be on the Oak Cliff State Bank & Trust Company to show that it did not have notice of Mrs. Smith's unrecorded mortgage, and that the bank has failed to show it had no notice of this mortgage.

[39] The Oak Cliff State Bank & Trust Company has also objected to my decision that the excess proceeds from the sale of each 3,000 bushels of wheat over the amount necessary to satisfy the mortgage on each 3,000 bushels of wheat should go to the unsecured creditors rather than to the mortgage holder whose 3,000 bushels had been dissipated. I decided that the attaching creditor (the trustee) was entitled to this excess because I did not see how the mortgages could be sustained except upon the theory that when 3,000 bushels of wheat was mortgaged, same being a part of a larger mass, this technically segregated the 3,000 bushels of wheat mortgaged. The mortgages, in my opinion, cannot be sustained upon the theory that each subsequent mortgagee has an inferior lien upon the wheat already mortgaged, in addition to the first lien upon the wheat covered by his own mortgage. Should it be considered that the mortgages covered the entire stock of wheat, and should be paid in the order in which they were filed, and that the provision with reference to 3,000 bushels covered by the mortgage was only for the purpose of limitation in case the wheat went down in value, so that the value of 3,000 bushels would not cover the amount of the mortgage, such limitation having no effect in favor of the mortgagor or his attaching creditors, but merely shutting off each mortgage holder when he had consumed the proceeds of 3,000 bushels of wheat until the other mortgage holders should be satisfied, it seems to me the effect of such a construction as this would change the nature of the mortgages altogether. Of course, the mortgage holders are unsecured creditors as to any property the mortgagor had in addition to that mortgaged, but the trustee is a secured creditor. Therefore I have decided that the excess proceeds from the sale of 6,000 bushels of wheat over the amount sufficient to satisfy the first two mortgages, each being on 3,000 bushels, belongs to the unsecured creditors.

John F. Murphy, of Dallas, Tex., for bankrupt.

Lawther & Pope, of Dallas, Tex., for trustee.

Holland & Bartlett, of Dallas, Tex., for Dallas County State Bank.

Morris & Williamson, of Dallas, Tex., for Oak Cliff State Bank & Trust Co.

Byrd E. White, of Lancaster, Tex., for White & Co.

X. R. Craig and John W. George, both of Dallas, Tex., for Mrs. Wallace B. Smith.

Read, Lowrance & Bates, of Dallas, Tex., for J. R. Smith.

Burgess, Burgess, Chrestman & Brundidge, of Dallas, Tex., for Fairbanks, Morse & Co.

Davis, Johnson & Handley, of Dallas, Tex., for Anglo-American Mill Co.

W. P. Donaldson, of Dallas, Tex., for receiver of Farmers' & Merchants' Bank.

Claude McCallum, of Dallas, Tex., for E. R. Cox and others.

Short & Field, Synnott & Duggan, W. P. Donaldson, and A. B. Flanary, all of Dallas, Tex., for Farmers' & Merchants' Bank of Cedar Hill.

MEEK, District Judge. This is a review of an order made by Hon. E. M. Baker, referee in bankruptcy of the Dallas division, wherein and by which he fixes the rights of classes of claimants and also individual claimants against the estate of the bankrupt, Elijah F. Ballard. The petitions for review include what are in fact several made by W. J. Lawther, trustee of the estate; that of E. R. Cox et al.; that of Farmers' & Merchants' Bank of Cedar Hill and M. O. Durrett, its receiver; and that of Oak Cliff State Bank & Trust Company. By agreement of the parties the causes were consolidated, heard together, and one order was entered by the referee, taking care of the various contests involved.

The issues made and submitted to the referee, and decided by him, were many and complicated. The manner in which this bankrupt conducted a banking and a milling business at Cedar Hill and another milling business at Lancaster, both places in Dallas county, is found the reason for this. He organized this bank, having little or no funds of his own, and interested with him in it a number of the substantial farmers and citizens of this little place. He was manager and cashier of the bank. Those associated with him in the bank reposed all confidence in him. He built this flour mill at Cedar Hill and proceeded to operate it for himself. He secured parties to become interested with him at Lancaster, and erected a flour mill there. He used for himself the moneys deposited in the Cedar Hill bank, through overdrafts.

Those interested in the bank with him, those interested with him in the flour mill at Lancaster, the farmers of the community who sold him their wheat, which was put into his large bins at Cedar Hill, also those who contracted with him for the machinery which he put into his mills at Cedar Hill and Lancaster, also those who sold him his various properties, also the individuals who loaned him money and the banks who loaned his bank money, but which was really for him to use individually, one and all stand before the bankruptcy court to-day

seeking something on their many claims. Those claimants whose claims are found to be secured in fact are indeed fortunate. During his short and absolutely careless career as a banker in this small place, there seems to have been no oversight of him by those who had embarked in the banking business with him. Many creditors are called upon to suffer loss. This course of conduct by the bankrupt has confused the legal and equitable rights of claimants and general creditors to a point where it has been difficult to analyze and adjust them.

The record from the referee includes a summary of the evidence heard by him; also his findings of facts and conclusions of law. Because of the great volume of the evidence submitted to the referee in the hearing before him, he handed to the clerk all of such transcribed testimony. I listened for a week or more to the arguments by counsel representing the contentions of their respective clients, and have also carefully considered their briefs, in connection with the record and the evidence before me. I have concluded that the referee has correctly decided each and all of the issues made by the pleadings and evidence. The referee has written an opinion in this matter, in the course of which he finds the facts and gives his conclusions of law, in a manner that makes it unnecessary for the judge to take up and answer questions submitted on this review.

Therefore the referee's order, made on the contest of the Farmers' & Merchants' Bank et al. is hereby in all things confirmed and made the order of the court as of the date entered by him.