*Decision will be entered under Rule 50.*

SMITH & WIGGINS GIN, INC., PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 83260. Filed February 1, 1962.

*Ben Ferrell Mitchel, Esq.*, for the petitioner.
*Sanford Perry Keziah, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the taxable years ending July 31, 1955, and July 31, 1956, in the respective amounts of $1,779.55 and $2,704.43.

The issues presented are (1) whether an amount received by a predecessor partnership as insurance proceeds for loss, by fire, of a cotton gin was expended by it in partial replacement of the gin with the result that the depreciation basis of the new gin, to the extent replaced with the insurance proceeds, is the same as that of the destroyed gin, under section 113(a)(9) of the Internal Revenue Code of 1939, and whether such gin and other property of the partnership were transferred by the partners to the petitioner in a transaction governed by section 112(b)(5) resulting in the same basis in petitioner's hands as in the hands of the transferors, under section 113(a)(8),; and (2) whether the respondent properly disallowed as a deduction for the year 1956 a portion of the amount claimed by the petitioner as rebates to patrons.

### FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference.

The petitioner is a corporation organized under the general corporation laws of the State of Mississippi, with its principal place of business in Merigold, Mississippi. It is engaged in the business of ginning cotton, bailing cotton for market, and buying and selling cottonseed ginned from seed cotton. It keeps its books and prepares its income tax returns on the basis of a fiscal year ending July 31,

and utilizes an accrual method of accounting. It filed timely Federal corporate income tax returns for the taxable years ending July 31, 1955, and July 31, 1956, with the district director of internal revenue at Jackson, Mississippi.

In 1945 a farming corporation known as Smith & Wiggins, Inc., located in Merigold, Mississippi, was liquidated and the assets of the corporation were distributed to the shareholders consisting of members of four family groups, the Smiths, Halls, Hills, and Hallmans. One of the assets distributed was a cotton-ginning plant. Thereafter, in 1945, the four family groups sold a 25-percent interest in the cotton gin to E. D. Rayner and his wife, and formed a partnership known as Smith & Wiggins Gin to gin cotton raised by the partners individually and by others. The property comprising the ginning plant consisted of a principal building in which the machinery was located, seed houses, tenant houses in which the labor was housed, a fuel tank, a manager's residence, a railroad siding, and land and leases on land. The interests in the partnership were held as follows: Rayner, Smith, and Hall families, 25 percent each; Hill family, 21 percent, and Hallman family, 4 percent.

The ginning season generally commences in the latter part of August. The 1948 cotton crop in the Mississippi delta was unusually large and labor was scarce. This resulted in the use of unorthodox methods of picking cotton, leaving the cotton in poor condition for ginning. The gin which the partnership owned was inadequate for handling the large crop and incapable of properly ginning cotton in this condition. Accordingly, E. D. Rayner, the gin manager, advised the partners that it would be necessary to remodel the gin in order to gin the 1948 crop. He had representatives from two manufacturers of gin machinery and equipment, namely, the Hardwicke-Etter Company and the John E. Mitchell Company, advise the partners as to what was needed. The partners decided to erect a new one-story steel building with reinforced concrete floor and install a double battery, 8-stand gin, and install new presses, using part of the old gin. On November 29, 1948, the partnership's representative wrote a letter to the New Orleans Bank for Cooperatives in which the possibility of securing a loan for the above purpose was explored.

On February 8, 1949, the partnership entered into a contract with Hardwicke-Etter Company for the purchase of machinery and equipment at a total cost of $35,287.62, to be discounted at 2 percent upon the payment of one-fourth cash down and payment of one-fourth on December 1, 1949, and the balance on December 1, 1950. The deferred payments were to be the subject of notes payable bearing interest from date of shipment. On March 9, 1949, the partnership entered into another contract with the same company for machinery and equip-

ment at a total cost of $28,007 under similar terms, the deferred payments to be made on November 1, 1949, and November 1, 1950. The prices shown in the contracts were to be adjusted to prices prevailing at the time of shipment. By March 15, 1949, the partnership had also entered into other orders, as will appear *infra*.

In the latter part of March 1949 a fire substantially destroyed the principal gin property consisting of the machinery and building in which it was housed. As of the date of the fire the fair market value of all the partnership property was $81,635.15, having an adjusted basis as of January 1, 1949, of $21,506.56. At some time not shown by the record the partnership received insurance in the amount of $47,208.57 for loss of property destroyed by the fire, and deposited it in the partnership's bank account. The adjusted basis of the property so destroyed was $12,437.24 as of January 1, 1949. The fair market value of the property not destroyed by the fire (being the seed houses, tenant houses, manager's residence, fuel tank, etc.) was $34,426.58, having an adjusted basis of $9,069.32 (including land having a basis of $658.60).

The rebuilding of the cotton gin was commenced as soon as possible after the fire in order to have the gin in operation for the 1949 ginning season. The original contracts with the suppliers of gin machinery and equipment were carried out, with some modifications. The partners decided to utilize some of the old equipment.

On May 7, 1949, the partnership's representative again wrote the New Orleans Bank for Cooperatives with respect to obtaining a loan. This letter contained the initial information required by the bank in order to begin negotiations for a loan and stated in part as follows:

There is submitted below tentative information with respect to the properties of Smith and Wiggins Gin of Merigold, Mississippi, at present a partnership but contemplating reorganization into a cooperative association under the agricultural laws of Mississippi.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(e) *Estimated Cost of New Gin Building and Machinery;* The estimated cost of the complete new gin which is predicated upon actual orders existing for machinery and materials and estimates of freight and construction are as follows:

| | |
|---|---|
| Gin Machinery | 96, 668. 27 |
| Gin Building | 31, 044. 20 |
| Power Plant | 20, 000. 00 |
| Total | 147, 712. 47 |

A summary of the foregoing costs showing machinery and the estimates of freight and installation, is included on a separate schedule and a detailed statement of the machinery and materials on order and of estimated construction costs are also included upon a separate schedule.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(f) *Pro Forma Statement of Completed Gin Plant:* Sound Value of

| | | |
|---|---|---|
| Existing Properties by Appraisal | | 32, 055. 49 |
| Sound Value of Real Estate owned | | 3, 025. 00 |
| Cost of Machinery & Buildings as set out above | 147, 712. 47 | |
| 5% allowance for error in Estimates of total cost | 7, 385. 62 | |
| | | 155, 098. 09 |
| *TOTAL NEW ADDITIONS* | | 190, 178. 58 |

(g) *Cash Requirements:* Total Cash Requirements—
New Properties to be supplied as follows:

| | |
|---|---|
| From New Orleans Bank for Cooperatives | 100, 000. 00 |
| Cash on Hand of present members | 45, 000. 00 |
| Additional capital to be supplied by members | 10, 098. 09 |
| *Total* | 155, 098. 09 |

The members are willing to execute an agreement guaranteeing that they will supply all funds that may be required to complete the gin plant building according to the present plans and commitments in excess of $100,000.00.

The statement attached to the above letter shows in detail the machinery, equipment, and building materials which, by March 9, 1949, had been ordered or purchased from the Hardwicke-Etter Company and from the John E. Mitchell Company, and equipment which had been ordered or purchased by March 15, 1949, from the Howe Scale Company, as well as estimates as of those dates of the cost of freight and installation. The total machinery, equipment, and building materials were listed at $131,758.72 (including, however, $8,411.20 for estimated local concrete work), which together with estimated freight and installation costs of $15,953.75 resulted in a total estimated cost of $147,712.47.

The New Orleans Bank for Cooperatives was organized under the Farm Credit Act and under its charter its loans were limited to cooperative organizations operating for the mutual benefit of agricultural producers. It was permitted to make loans to corporations organized under general corporation law provided they incorporated in their charters or bylaws the required agricultural cooperative features. In the instant case the partners had decided to incorporate their ginning business in order to limit the liabilities of the individuals. They submitted to the New Orleans Bank for Cooperatives an unexecuted proposed preorganization contract dated July 6, 1949, including a draft of a proposed charter. The bank suggested several changes in the proposed contract. During July and August 1949, there was correspondence between the partnership's representative and the bank concerning the form of the charter and the bylaws. One of the requirements for a loan was that there be at least 10 shareholders, who would be patrons of the gin. Accordingly, in order to meet this re-

quirement, on August 23, 1949, some of the partners executed a "Special Warranty Deed" by which they transferred to members of their families portions of their undivided interests in described real property held by the partnership and also in:

any and all other real and personal property of that copartnership known as Smith and Wiggins Gin, including cash on hand and undistributed profits from the ginning season for 1948–1949.

On the same date a preorganization contract was executed among the members of the partnership in which they agreed to set up a corporation. Such contract also set forth the proposed provisions of the charter and bylaws of the corporation. The contract, which met with the approval of the New Orleans Bank for Cooperatives, provided in part as follows:

2. The undersigned agree to apply for a charter for a corporation, to convey the property on which the Smith & Wiggins Gin, the said tenant houses and the said duplex dwelling now stand * * * to the corporation and that the ginning business heretofore operated as a partnership be after the incorporation operated by the corporation; that they shall incorporate the said business under the laws of the State of Mississippi and each of the undersigned who at the time that the corporate charter shall be applied for is an owner of part of the said property shall when requested by said E. D. Rayner, or any of the undersigned, join with the others in applying for the charter of the proposed corporation.

       *       *       *       *       *       *       *

5. The undersigned agree to so vote in their respective capacities as stockholders and directors of the said corporation so that the directors of the corporation for the first year shall be Edward B. Hill, J. C. Hallman, James Rogers Hall, J. R. Smith and E. D. Rayner. The undersigned do further agree that E. D. Rayner shall be elected president and general manager of the corporation for the first year; Ed. B. Hill shall be vice-president; and J. C. Hallman shall be secretary-treasurer.

6. The cotton gin on the aforesaid property was destroyed by fire during the year 1948. On April 6, 1949 the physical properties of the said partnership including the said property remaining after the fire, a duplex dwelling and ten tenant houses, all on the aforedescribed lands was appraised * * * and such appraisal showed the value of the property remaining after the fire and on said date to be $35,080.49. The amount of insurance collected as a result of the aforesaid fire is the sum of $45,046.28. The profits for the year 1948–49 have not yet been computed, but it is thought that said profits will be in the approximate amount of $35,000.00. * * * The sum of the aforesaid appraisal value of the property remaining after the fire in the above amount of $35,080.49 and the amount of insurance collected and the profits for the year 1948–49, the sum of all of which will amount to approximately $115,000.00 will for the purposes of this incorporation be accepted by all parties as, and in fact it is, the sound value of the said partnership property.

7. Each of the undersigned agrees to transfer his or her interest in the aforesaid partnership property * * * to Smith & Wiggins Gin, Inc., a corporation, in return for the corporation's common stock of a par value equivalent to the value of his or her respective interest in the property transferred. The aggregate par value of the stock to be issued to each of the undersigned shall bear the

same proportion to the total stock so issued as the interest of the undersigned in the said property to be conveyed bears to the total property conveyed at the time of the conveyance. * * *

8. It is understood that the corporation will build a new gin on the aforesaid gin property and it is the present intention of the undersigned that the corporation obtain a loan with such security as may be required for the purpose of securing funds to aid in rebuilding the said gin. It is realized that the total expenditure necessary to pay for the entire new gin will probably exceed the amount received by the undersigned from the said insurance plus the loan to be secured. The undersigned hereby agree to purchase in cash money such additional stock of the said corporation as will be reasonably necessary in the discretion of the Board of Directors of the said corporation to pay for the remainder of the said gin. The percentage of interest which the undersigned own in the aforesaid partnership business at the time of the aforesaid conveyance to the corporation is the percentage of the additional stock hereby subscribed for and to be paid for by the undersigned.

On August 24, 1949, the State of Mississippi granted a corporate charter to the petitioner, Smith & Wiggins Gin, Inc., pursuant to application filed on that date. On August 26, 1949, the incorporators had an organization meeting at which directors were elected. The minutes of that meeting contain the following:

Upon motion duly made and seconded, all persons present and represented voting "Aye", it is hereby found and resolved that the following persons have paid for their stock in cash and are hereby found and adjudged to be stockholders in this corporation and the proper officers of this corporation, when elected, are hereby ordered to issue unto them the aforesaid shares of stock and which stock certificates shall be dated August 26, 1949, * * *. [Then follows a list of 11 persons to receive a total of 2,000 shares of stock.]

The above 2,000 shares, par value $25 per share, when issued bore the date of August 26, 1949. The first meeting of the board of directors was also held on August 26, 1949, at which bylaws were adopted.

The New Orleans Bank for Cooperatives approved the loan application and on August 31, 1949, made a commitment to loan the petitioner $153,000, disbursements of the loan to be made upon request of the petitioner. The loan commitment was subject to the condition that prior to requesting advances the petitioner would furnish the bank an audit and a certificate listing the members who had signed membership and patronage agreements, and showing the capital investment of each member.

By deed and bill of sale dated September 1, 1949 (bearing canceled documentary stamp taxes in the amount of $38.50), which was notarized on various dates from September 6 to October 4, 1949, and which was recorded on October 8, 1949, the members of the partnership transferred to the petitioner all the property of the partnership. The deed and bill of sale states in part:

Whereas the undersigned are the owners of all of the hereinafter described property and desire to transfer same to Smith & Wiggins Gin, Inc., a corporation,

for stock in said corporation so that the grantors herein will become the owners of said stock in substantially the same proportion in which they own the hereinafter described property prior to this exchange,

Now, therefore for and in consideration of the issuance by Smith & Wiggins Gin, Inc., a corporation, of the following respective percentage of shares of its total outstanding Common stock to the following respective persons, so that immediately after this transfer the said persons will own the following respective percentage of the outstanding stock of said corporation, to wit: Jeannette P. Hill, 20%; Ed B. Hill, 1%; J. C. Hallman, 2%; Sula Martin Hallman, also known as Sula M. Hallman, 2%; J. R. Smith, 16.59%; Sarah G. Smith, 8.41%; Bess F. Rayner, 12.5%; E. D. Rayner, 12.5%; Frank J. Hall, Sr., also known as Frank J. Hall, 8.34%; Frank J. Hall, Jr., a single man, 8.33%; and James Rogers Hall also known as Rogers Hall, a single man, 8.33%; the receipt of all of which stock is hereby acknowledged, the undersigned * * * do hereby convey * * * [here follows description of real property] and

Also, any and all improvements located on the above described property or any part thereof, including railroad spur tracks, tank, machinery, scales and any other machinery or equipment used or fit for use in or about or in connection with the cotton gin on aforesaid property; also, the complete gin outfit and all buildings appurtenant thereto which are situate upon the aforedescribed property, including engines, boilers, belting, gin stands, presses, appliances, utensils and equipment which will constitute a complete cotton ginnery and any and all other buildings, improvements, additions and fixtures thereon;

Also, any and all other real and personal property of that certain copartnership known as Smith & Wiggins Gin, including cash on hand and undistributed profits from the ginning season for 1948–49.

Pursuant to the above contract 3007 shares of stock of $25 par value were issued to the shareholders. When issued they bore the date of September 1, 1949.

In accordance with the conditions set forth above for the actual withdrawal of loans, there was submitted to the New Orleans Bank for Cooperatives a "Schedule of Members Pro-Rata Ownership September 17, 1949." This statement showed the individual percentages of ownership of the corporation and represented that such ownership was attributable to insurance money in the amount of $47,208.57, new money in the amount of $43,000, and existing property values in the amount of $35,080.49, or a total equity of $125,289.06. In addition, it showed advances made by the stockholders in the amount of $67,068.83 (this includes an advance by a nonstockholder-member in the amount of $3,705.74). The amount of $67,068.83 was stated to consist of "Net Profits from 1948–49 operations of $60,068.83 plus $7,000.00 advances from stockholders." It was also stated that the company made a local bank loan of $20,000 to complete the construction, which was not included in the above figure.

Thereafter, at a time not shown by the record, the petitioner borrowed a total of $105,000 from the New Orleans Bank for Cooperatives, of which it was required to invest $5,000 in stock of such bank.

Construction of the new gin had continued during the summer of 1949 under the superintendency of Rayner. A reinforced concrete

floor was laid and during the summer heavy machinery comprising the gin was received. Rayner assured the machinery salesman that he would pay for the machinery and take all discounts. Fifty thousand dollars was borrowed by the partners or the partnership from the Cleveland State Bank and Rayner also put in some of his own money in order to promptly pay the bills upon delivery of machinery, equipment, and materials to insure receiving the cash discount. By August 1949, when the ginning season started, one battery of the gin was complete and in operation and substantial portions of the other battery were on the floor and in the process of being installed. It was completed sometime in September 1949, by the corporation. After the petitioner was organized and had received proceeds of the loan from the New Orleans Bank for Cooperatives it repaid out of such proceeds the amount which had previously been borrowed by the partners or the partnership from the Cleveland State Bank, and other lenders were also paid.

The petitioner filed its first Federal income tax return for the taxable year ended August 31, 1950. In its schedule of depreciation the petitioner included, at a cost of $177,579.09, all the machinery, equipment, and buildings which had been included, at an estimated cost of $147,712.47, in the statement of estimated costs of rebuilding the gin as set forth in the statement attached to the letter of May 7, 1949, from the partnership to the New Orleans Bank for Cooperatives.[1] In addition, such schedule showed other items, namely, driveways, concrete cotton platform, firefighting equipment, and cleaners, at a cost of $11,255.59, or a total cost of $188,834.68. The balance sheet of the petitioner as of August 31, 1949 (included in its return for its first taxable year), may be summarized as follows:

*August 31, 1949*

### ASSETS

| | |
|---|---|
| Cash (on hand and in bank) | $19,637.86 |
| Machinery and equipment (new) | 169,859.72 |
| Other assets | 22,001.40 |
| Total assets | 211,498.98 |

### LIABILITIES

| | |
|---|---|
| Equity in cooperative reserve fund | 14,984.73 |
| Accounts payable | 19,236.85 |
| Notes payable | 20,000.00 |
| Capital stock | 0 |
| Members accounts (aggregate) | 157,277.40 |
| Total liabilities | 211,498.98 |

---

[1] The difference in cost reported and the previously estimated cost may be due to the fact that machinery and equipment prices were subject to adjustment to prices prevailing at the date of shipment.

In its Federal income tax return for the taxable years ended July 31, 1955, and July 31, 1956, the petitioner deducted depreciation in the respective amounts of $15,876.10 and $17,250.54. In the notice of deficiency the respondent disallowed claimed depreciation for those years by the respective amounts of $5,747.36 and $5,768.94.

In computing the depreciation upon that portion of the property which had not been destroyed by fire the petitioner used as the original cost to it an amount equivalent to the fair market value thereof as of the date of the fire ($34,426.58). In computing the depreciation on the new gin, the petitioner used as the original cost to it the entire cost of construction thereof, $188,834.68.

The respondent determined that the properties in question had been acquired by the petitioner in 1949 in exchange for stock in a transaction to which section 112(b)(5) of the Internal Revenue Code of 1939 applied and that consequently under section 113(a)(8) of such Code the bases thereof in its hands at the time were the same as in the hands of the transferors. He determined that as of September 1, 1949, the basis in the hands of the transferors of the property which the partnership had owned at the time of the fire was $15,039.12. He allocated this basis, in proportion to fair market values, between the property destroyed by the fire and the property not destroyed, $8,697.12 being assigned to the property destroyed and $6,342 to the property not destroyed. He in effect held that the partnership took the insurance money and used it, in partial payment, for reconstructing the destroyed gin; that within the meaning of section 112(f) of the Internal Revenue Code of 1939 the money was expended by the partnership in the acquisition of other property similar or related in service or use, resulting in nonrecognition of the gain upon the conversion; and that, therefore, under section 113(a)(9) of the Code that portion of the new gin acquired with the $47,208.57 insurance money retained the same basis as that of the property destroyed, namely, $8,697.12. He therefore held that under section 112(a)(8) the petitioner's basis of the property transferred to it by the partners, consisting of the undestroyed property and the property acquired in replacement of the destroyed property (that is, the new gin to the extent of $47,208.57 of its cost), remained $15,039.12, instead of the basis claimed by the petitioner in the amount of $81,635.15. For the years in question he allowed no depreciation on the property not destroyed by fire, holding that the basis thereof had already been exhausted.

At the hearing the respondent conceded that he had made an error in the adjusted bases of the properties in the hands of the transferors and stated that the proper adjusted bases, as of January 1, 1949, in their hands were $12,437.24 for property destroyed by fire and $9,069.32 for property not destroyed by fire.

The partnership constructed the new gin and invested therein the insurance proceeds of $47,208.57. All the partnership property, including the new gin, was transferred by the partners to the petitioner upon its organization in exchange for stock, and the stock received by each partner was substantially in proportion to his interest in the property prior to the exchange.

*Patronage Rebates.*

The charter of the petitioner provides that its stock may be owned only by persons or organizations who produce seed cotton directly or as landlords or tenants. It grants wide powers to engage in business, including all those powers conferred by chapter 4, title 21, Mississippi Code (1942) and amendments thereto. The charter provides that the rights and powers shall be exercised primarily for the benefit of the stockholders as producers of seed cotton. It is provided therein that no bylaw may be altered or repealed with reference to patronage rebates and discounts due to stockholders and nonstockholder members, except by a vote of 80 percent of the issued and fully paid outstanding stock.

The bylaws provide that any person or organization producing seed cotton may become a nonstockholding member by entering into a membership and patronage agreement with the petitioner, but that business transacted with nonstockholder-members shall not be greater in value than that transacted with stockholder-members; that nonstockholder-members shall be treated the same as stockholder-members with respect to rebates and discounts upon patronage contributed by the nonstockholding members; that any person or organization which produces agricultural products which are handled through the petitioner, but which does not enter into a membership and patronage agreement shall be known as a nonstockholding nonmember; that nonstockholding nonmembers shall be entitled as a matter of right to no rebates and no discounts upon their patronage, but that the board of directors may pay such rebate per bale as they deem necessary to meet competition; and that neither nonstockholder-members nor nonstockholder nonmembers shall have any voice in the management of the affairs of the petitioner and no equity in its capital surplus or reserve.

Both the stockholders and the nonstockholder-members are required by the bylaws to sign membership and patronage agreements, agreeing to deliver to the petitioner's gin for ginning all cotton produced by or for them in the area served by the gin and to sell to the gin or deliver to it for marketing or processing all the seed from such cotton, under penalty of payment of $10 for each bale of cotton which is not so delivered to the petitioner for ginning.

The bylaws provide that the petitioner shall charge the current price for ginning, and that it shall at the time the cotton is ginned make settlement for the cottonseed; that the excess revenue from ginning and wrapping cotton and from all other sources, except from the sale of cottonseed, is to be determined by deducting from the gross revenue therefrom various expenses, including cost of operation of the gin, depreciation, and interest on indebtedness. The excess revenue from trading in cottonseed is to be determined by deducting from the proceeds from sale of cottonseed the cost of the seed purchased or the amount advanced against the cottonseed and items of expense directly attributable to the handling of the cottonseed.

It is further provided that the corporate earnings of the petitioner shall be that part of the aggregate excess revenue not in excess of 6 percent of the par value of the issued and outstanding stock. It is provided that such corporate earnings shall be deducted pro rata from the excess revenue derived from the two categories of revenue (from sale of cottonseed on the one hand and from charges for ginning and other revenue on the other hand), and shall be declared as an annual cash dividend upon the outstanding stock, although it is provided that the dividend may be reduced to the extent necessary to pay income taxes.

It is further provided that that part of the excess revenue (remaining after deducting an allocable portion of the 6 percent) from ginning and wrapping cotton and all other sources, except from cottonseed trading, shall be credited to the stockholders and nonstockholder-members in the ratio that the total pounds of seed cotton ginned for each bears to the total pounds of seed cotton ginned by all of the stockholders and nonstockholder-members, and that the part of the excess revenue remaining from trading in cottonseed shall be credited to the stockholders and nonstockholder-members in the ratio that the total pounds of cottonseed delivered by each bears to the total cottonseed delivered by all the stockholders and nonstockholder-members. It is provided that these amounts so credited shall constitute the discount or patronage refunds to which the stockholders and nonstockholder-members are entitled, and that they shall be paid by cash or check of the petitioner. It is further provided that for the purpose of computing the amount of discount or rebate to which each is entitled, there shall be included in the weights of seed cotton ginned and cottonseed delivered for each, all the cotton grown or controlled by him and ginned at the petitioner's gin.

It is further provided that in the event there is a net deficit for any year resulting from either ginning or dealing in cottonseed, such deficit shall be charged to the stockholders and nonstockholder-members in the same proportion as above provided.

It is further provided that in each fiscal year each stockholder shall subscribe and pay for a proportionate amount of any additional common stock necessary for the purpose of retiring the principal of mortgage debt or expenditures for capital improvements.

The membership and patronage agreement which stockholders and nonstockholder-members were required to sign provided that the agreement should cover all cotton and seed therefrom produced or acquired by the patron, and it was provided that all cotton and cottonseed produced on the lands of the patrons or on lands owned, controlled, or operated by them should be prima facie presumed to be the cotton and cottonseed of the patrons.

During the years of its existence, including the taxable year ending July 31, 1956, the petitioner's operations were in accord with its bylaws.

At all times during the year in question all of the petitioner's stockholders had executed membership and patronage agreements as prescribed in the bylaws. In such year there were no nonstockholders with patronage agreements with the petitioner. The petitioner held itself open to the public for ginning of cotton and a part of its business was with nonstockholder-nonmembers. The petitioner charged the standard price for ginning cotton and paid the standard price for the seed in the case of both stockholders and nonmembers. While it was under no obligation to rebate anything to nonmembers in practice it did make a flat rebate of $3 per bale, in order to meet competition.

The petitioner ginned cotton delivered by tenants of stockholders and this was entered on petitioner's records under the names of the stockholders. Each ticket, however, indicated the name of the tenant or the particular farm, in order that the landlord could identify the source. One member might have as many as 12 or 15 such sources. When the rebate to which each member was entitled was computed, the member was credited with not only the cotton which he grew and brought to the gin, but also that of his tenants. The rebate was made to the member, and not to the tenant.

In its income tax return for the taxable year ended July 31, 1956, the petitioner computed taxable net income of $12,812.16. Its computation is summarized as follows:

| | | |
|---|---|---|
| Ginning income—6,328 bales cotton | $63,499.96 | |
| Cost of ginning | 64,646.95 | |
| Loss on ginning | | ($1,146.99) |
| Bagging and ties | 25,324.00 | |
| Cost of sales | 12,536.80 | |
| Gain on bagging and ties | | 12,787.20 |

Miscellaneous income:

| | | |
|---|---:|---:|
| Drayage | $3, 165. 00 | |
| Cotton council charges | 633. 00 | |
| Purchases discounts | 1, 116. 05 | |
| Oil Mill dividend | 80. 00 | |
| Rental | 522. 00 | |
| Cotton account | 153. 93 | |
| | | $5, 669. 98 |
| Cottonseed trading—sales | 138, 678. 22 | |
| Gin price paid $113, 487. 61 | | |
| Expenses 1, 046. 38 | 114, 533. 99 | |
| Gain on seed | | 24, 144. 23 |
| *Gain on ginning and seed* | | 41, 454. 42 |
| Rebates to patrons on seed | 16, 552. 13 | |
| Rebates to patrons on ginning | 11, 661. 79 | |
| Total rebates to patrons | | 28, 213. 92 |
| Net income—taxable to State of Mississippi | | 13, 240. 50 |
| Less: Mississippi income tax | | 428. 34 |
| Net income—taxable to U.S. | | 12, 812. 16 |

The amount of $13,240.50 in the above calculation represents 6 percent of the par value of the petitioner's issued and outstanding capital stock of $220,675. The total rebates of $28,213.92 represents the excess of the gain on ginning and seed, $41,454.42, over such figure of $13,240.50.

In the notice of deficiency the respondent decreased the amount of claimed deductible rebates by the amount of $4,361.91, with the following explanation:

In your return for the taxable year ended July 31, 1956, you deducted rebates to patrons in the amount of $28,213.92. It is determined that the maximum allowable deduction for rebates is $23,852.01, as computed below. Therefore, your income is increased by the amount of $4,361.91. Section 162 of the Internal Revenue Code of 1954.

| | |
|---|---:|
| Cotton ginned belonging to members' tenants (1286 bales) (1286/6328) | 20. 32% |
| Cotton ginned belonging to non-members | 6. 15% |
| Percentage of non-member business to total business | 26. 47% |
| Net profit before rebates, dividends and income taxes | $45, 678. 97 |
| Less: Amount required to be reserved (6% of outstanding capital stock, $220,675.00) | $13, 240. 50 |
| Balance | $32, 438. 47 |
| Percentage of member business to total business (100%—26.47%) | ×73. 53% |
| Maximum deductible rebates | $23, 852. 01 |

OPINION.

The first question relates to the basis to be used by the petitioner in computing allowable depreciation, under section 167 of the Internal Revenue Code of 1954, on its cotton gin property for the fiscal years ending July 31, 1955, and July 31, 1956. Since the petitioner acquired the property in a transaction to which the Internal Revenue Code of 1939 applied, the basis is to be determined by reference to the provisions of that Code. (See sec. 1052, I.R.C. 1954.) There are set forth in the margin pertinent provisions of the 1939 Code as they existed in 1949.[2]

The parties are in accord that to the extent the gin property of the partnership was destroyed by fire there was an involuntary conversion of property into money, and that under section 112(f) no gain was or is to be recognized. However, the respondent determined that the

---

[2] Section 112(b)(5) of the Internal Revenue Code of 1939 provided:

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. Where the transferee assumes a liability of a transferor, or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under subsection (k) it is not to be considered as "other property or money") shall be considered as stock or securities received by such transferor.

Section 113(a)(8) of such Code provided:

(8) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If the property was acquired after December 31, 1920, by a corporation—

(A) by the issuance of its stock or securities in connection with a transaction described in section 112(b)(5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), or

(B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.

Section 112(f) of such Code provided:

(f) INVOLUNTARY CONVERSIONS.—If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted, or into money which is forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, or in the acquisition of control of a corporation owning such other property, or in the establishment of a replacement fund, no gain shall be recognized, but loss shall be recognized. * * *

Section 113(a)(9) of such Code provided:

(9) INVOLUNTARY CONVERSION.—If the property was acquired after February 28, 1913, as the result of a compulsory or involuntary conversion described in section 112(f), the basis shall be the same as in the case of the property so converted, decreased in the amount of any money received by the taxpayer which was not expended in accordance with the provisions of law (applicable to the year in which such conversion was made) determining the taxable status of the gain or loss upon such conversion, and increased in the amount of gain or decreased in the amount of loss to the taxpayer recognized upon such conversion under the law applicable to the year in which such conversion was made.

insurance proceeds, $47,208.57, were expended by the partnership in the acquisition of other property similar or related in service or use to the property so converted, namely, a new gin, with the result that the new gin, to the extent constructed by the partnership with the insurance money took the basis of the property converted, under section 113(a)(9). He further held that the partners transferred both the property which had not been destroyed by fire and the new gin to the petitioner in a transaction governed by section 112(b)(5), and the adjusted basis in the hands of the partnership of the assets not destroyed by fire as well as the adjusted basis of that portion of the new gin attributable to the investment of the insurance proceeds carried over to the petitioner, under section 113(a)(8). The respondent's determination has the benefit of a presumption of correctness, and the burden of proof is upon the petitioner to show that it was erroneous.

The petitioner contends that, within the meaning of section 112(f), the insurance money was not expended by the partnership in the acquisition of other property similar or related in service or use to the property converted, but, rather, was expended by the partners in acquiring control of the petitioner, a corporation owning such other property (the new gin); that consequently the property acquired with the insurance proceeds was stock of the petitioner, and that under section 113(a)(9) it was the stock, rather than the gin, which took the basis of the property destroyed. The petitioner also denies that section 112(b)(5) and section 113(a)(8) have any application. Rather, it contends that it received the insurance money and other cash in exchange for stock, and that it built the new gin, resulting in a basis in its hands of the gin of the total amount expended in constructing it. It also contends that the undestroyed property was acquired in exchange for stock and the basis in its hands is an amount equivalent to the fair market value of such undestroyed property, namely, $34,426.58.

Prior to August 24, 1949, the date that the petitioner was incorporated, the new gin was substantially completed and was in partial operation. Substantially all the machinery and materials necessary to complete the gin had been contracted for and were on hand and in process of assembly. The petitioner, nevertheless, maintains that it owned the new gin at the time of its incorporation, its contention being as follows: After the old partnership gin was destroyed by fire the partnership ceased to exist and the individuals entered into an oral agreement to form a corporation (the petitioner) and to subscribe for stock therein with the insurance proceeds and sufficient other cash which would be necessary, together with a prospective loan to be obtained, to construct a new gin; that the agreement was carried

out; that all things which were done in connection with the reconstruction of the gin prior to the date of incorporation of the petitioner were done on its behalf; and that consequently upon organization the new gin belonged to the petitioner, thus qualifying the transaction under section 112(f) as an investment of the insurance proceeds in stock of a corporation owning property similar or related in service or use to the destroyed gin.

We find ourselves unable to agree with the petitioner. In our opinion it is immaterial whether there was an oral agreement among the partners as contended by the petitioner. Neither the written agreement nor any oral agreement among them would be sufficient to create a corporation. As stated in 8 Fletcher, Cyclopedia Corporations, sec. 3996:

> The mere intent of partners or associates to incorporate or their agreement to do so will not alone constitute them a corporation, [footnote omitted] and, as will be seen, they cannot, as against creditors who have dealt with them as partners, successfully claim that they are a de facto corporation. [Footnote omitted.]

See also *In re Ballard*, (N.D. Tex.) 279 F. 574, in which it is stated that a de facto corporation is one actually organized and the charter filed, but having some defect. We have examined the authorities cited by the petitioner on brief, including *London Assurance Co. v. Drennen*, 116 U.S. 461, but find nothing therein in conflict with the basic rule just stated.

Accordingly, it cannot be considered that the new gin was built by or on behalf of the petitioner, and that, within the intendment of section 112(f), the partners acquired control of a corporation owning property similar or related in use to the property converted (the destroyed gin). Rather, we think the evidence shows that the partnership continued in existence, constructed the new gin, and transferred it to the petitioner.

The record shows that prior to the date of the fire the partnership had decided to build a new cotton gin, had entered into contracts for the purchase of all the necessary machinery, equipment, and building materials, and that as early as November 29, 1948, had contacted the New Orleans Bank for Cooperatives with a view to obtaining a loan. No steps were taken to dissolve the partnership.[3] After the fire these contracts were carried out by it, except for some possible modifications. Actually the items upon which the petitioner claims depreciation are substantially the same as those which had originally been ordered by the partnership. Although the costs are somewhat

---

[3] On the contrary, at various times representations were made that the partnership was in existence, as in the letter of May 7, 1949, from the partnership to the New Orleans Bank for Cooperatives, in the transfers of August 23, 1949, of certain partnership interests, and in the deed and bill of sale of September 1, 1949.

greater than the estimate originally made by the partnership, this may have been due to the fact that the prices were subject to adjustment as of the date of delivery.

During the summer of 1949 all the machinery, equipment, and materials which had been ordered were delivered and at least a portion of the contract prices was paid in order to obtain cash discounts. Payments were made with money borrowed from a bank and from other cash available to the partnership or the partners. No money was borrowed from the New Orleans Bank for Cooperatives until sometime after September 17, 1949, which was after the petitioner was organized, and then the proceeds of the loan were used by the petitioner to pay off loans which had been previously obtained by the partnership or the partners to finance the construction.

While E. D. Rayner, who was in charge of rebuilding the gin, and Rogers Hall testified that in pursuance of the resolution of the incorporators at their meeting on August 26, 1949, shares of stock were issued for cash, including the insurance money, the testimony and other evidence upon this subject is confusing and contradictory. In this situation it is not a matter of believing or disbelieving the testimony of the witnesses, but of properly construing the meaning thereof. The insurance proceeds were placed in the bank account of the partnership and, insofar as the record shows, were commingled and subject to disbursement with any other funds of the partnership. Rayner testified that the agreement of the partners was that he would be the president of the corporation to be organized, that the partners paid the insurance money to him in conformity with the agreement, that the money was expended for gin machinery and the erection of the gin, and that in building the gin he was working for the corporation.[4] Hall testified that during the summer of 1949 he, as a former partner, was engaged in the rebuilding of the gin, but that he was acting under a contract for incorporation. Since the machinery was

---

[4] Rayner's testimony was in part as follows:

"It [the corporation] hadn't been drawn up. As I said it was a lot of trouble to get all of this done but it was agreed upon because none of the partners wanted to be responsible for the other fellow's debt and we agreed on a corporation when we agreed to build the gin over. That is facts as near as I can remember it.

By Mr. Mitchell:

Q. And they agreed, then, were you to be made president of this corporation?

A. Yes, sir, I was.

Q. Did they agree to pay up and did they pay in their insurance money for stock?

A. They did.

Q. Did they pay other money in for stock?

A. Yes, sir.

Q. But I take it, Mr. Rayner, that you could not afford to stand by with a crop deteriorating on waiting for the formalities of the contracts and the charters to build a gin?

A. That is exactly the truth, and may I say this? Maybe you have forgotten. We went to the Cleveland State Bank and borrowed, I believe—I forget—$50,000. I think I put some of my own money in that, anything to pay out of debt, our bills because we could get a cash discount as our stuff came in if we paid it, and that was the reason we kept those bills paid up."

purchased and the gin was substantially completed before the corporation came into existence, this testimony would seem to indicate that such funds were actually expended by the partnership, rather than being retained and actually paid to the corporation for stock. We also note that the balance sheet of the petitioner as of August 31, 1949, shows "Machinery & Equipment (New)" in the amount of $169,859.72, which is offset substantially by an amount of $157,277.40, a liability account denominated "Members Accounts," which consists of insurance money, $47,208.57; new money, $43,000; and advances, $67,068.83. There is no item to indicate that $50,000 or any amount of cash had been actually paid in on account of stock subscriptions—indeed the balance sheet shows no stock issued as of that time. The cash on hand and in the bank was shown to be only $19,637.86, and it may well be that such cash is represented by the note payable of $20,000 shown among the liabilities.

In the light of the whole record we cannot construe the testimony as establishing that the insurance proceeds were literally or actually paid in cash to the petitioner for stock. Rather, the testimony of the witnesses appears to represent a conclusion that since the partners had agreed to pay the insurance money and other cash to the prospective corporation in exchange for stock, any cash payments made by the partners in reconstruction of the gin were paid on its behalf and were tantamount to payments in pursuance of their subscription to the stock. As we have indicated hereinabove, we think that such premise is not tenable.

By the specific terms of the deed and bill of sale dated September 1, 1949, the members of the partnership transferred to the petitioner all the real property of the partnership, including a complete cotton ginnery, and any other personal property of the partnership, including the cash on hand and undistributed profits, in consideration of the issuance of stock of the petitioner to them.[5] It was also provided therein that the partners were to become the owners of the stock in substantially the same proportions in which they owned the property prior to the exchange.

In view of all the foregoing, it is our conclusion, and we have found as a fact, that the partnership constructed the new gin, that it invested therein the insurance proceeds, that all the partnership property, including the new gin, was transferred by the partners to the petitioner upon its organization in exchange for stock, and that the amount of the stock received by each partner was substantially in proportion

---

[5] On brief the petitioner made much of the fact that the deed and bill of sale of September 1, 1949, bore documentary stamp taxes in the amount of only $38.50, contending that this is indicative that the transfer at that time did not include the rebuilt gin. We think this is of no significance in view of the other evidence of record, including the terms of the instrument itself.

to his interest in the property prior to the exchange. It follows, therefore, that the transactions fall within the provisions of sections 112(f) and 112(b)(5); that under section 113(a)(9) the new gin, to the extent acquired by use of the insurance proceeds in the amount of $47,208.57, retained the same basis in the hands of the transferors as the old gin which was destroyed; that under section 113(a)(8) such basis carried over to the petitioner; and that under such section the basis in the hands of the petitioner of the undestroyed assets transferred to it was also the same as the basis in the hands of the transferors.

At the hearing the parties agreed that at January 1, 1949, the basis in the hands of the transferors of the property destroyed by fire was $12,437.24 and of the property not destroyed by fire was $9,069.32, and that these agreed adjusted bases should be the starting point in the recomputation of the adjusted bases to be carried over into the hands of the petitioner. This agreement will be given effect in the recomputation under Rule 50.

## Patronage Rebates.

Both parties agree that the petitioner is not a farmers' cooperative organization exempt from tax to the extent provided in section 521 of the Internal Revenue Code of 1954. Rather, they both agree that it is taxable as a corporation organized for profit under general corporate law, although having some cooperative features. In the years in question all of petitioner's income was derived from business with stockholder-members and with nonmembers, there being no nonstockholder-members. The respondent's determination recognizes that patronage rebates to the extent attributable to stockholder-member business may be deducted from or excluded from the petitioner's income. In its return the petitioner deducted $28,213.92 as representing patronage rebates to such stockholder-members, but the respondent disallowed $4,361.91 of this amount, holding that to this extent the payment to the stockholders did not represent a rebate on business furnished by them, but was attributable to profit made on nonmember business.

Since the petitioner is a taxable corporation all its profits, whether from member or nonmember business, constitute income to it, except to the extent the petitioner was under obligation to make patronage dividends, refunds, or rebates of any portion thereof. *Peoples Gin Co.* v. *Commissioner*, (C.A. 5) 118 F. 2d 72, affirming 41 B.T.A. 343. Of course, if a patronage dividend, refund, or rebate is made to patrons, whether stockholders or not, pursuant to an obligation to do so, the amount thereof is not to be included in the petitioner's income. *Uniform Printing & Supply Co.* v. *Commissioner*, (C.A. 7) 88 F. 2d

75. *Producers Gin Association, A.A.L.*, 33 T.C. 608, although distinguishable upon its facts, states the established principles as follows:

We regard it as settled law that a patronage dividend paid by a nonexempt cooperative may, in proper cases, be excluded from its gross income despite the lack of a specific statutory provision, on the theory that the patronage dividend is merely a yearend discount based on the volume of the customer's annual business. *Pomeroy Cooperative Grain Co.*, 31 T.C. 674; *Clover Farm Stores Corporation*, 17 T.C. 1265; *Dr. P. Phillips Cooperative*, 17 T.C. 1002; *United Cooperatives, Inc.*, 4 T.C. 93; *Uniform Printing & Supply Co.* v. *Commissioner*, 88 F. 2d 75. To qualify for exclusion, however, the allocation of earnings must have been made pursuant to a preexisting legal obligation. Furthermore, the distribution must have been made out of profits or income realized from transactions with the particular patrons for whose benefit the allocation was made, rather than from transactions with other persons or organizations not entitled to participate in the allocation. Thus, the patron receiving the rebate should be the one whose patronage created the particular type of profit distributed to him.

In the instant case both the stockholders and the nonmembers were charged the same for ginning and received the same amount for cottonseed. A flat sum per bale of cotton ginned was rebated to those nonmembers who were not tenants of stockholders, and such rebates were deducted in computing the petitioner's gain on ginning. However, such nonmembers were not entitled to any further rebate. Nor were they entitled to receive any further amount for the cottonseed, even though the petitioner was able to realize more upon it than it had paid the nonmembers.

The bylaws of the petitioner provided that petitioner's earnings should be that part of the aggregate earnings not in excess of 6 percent of the par value of the issued and outstanding stock, and that such amount should be declared as a dividend. They further provided that the amount so computed should be deducted pro rata from the profit derived by the petitioner from ginning cotton and other sources and from dealing in cottonseed, and that the remainder should be credited to the members in the ratio of the cotton and seed delivered by each of the members, including in each member's total the amount furnished by that member's tenants. The membership and patronage agreements between the petitioner and its stockholder-members reflected these provisions.

Since the amount equal to 6 percent of outstanding capital stock was, by the terms of the bylaws and the contracts, to be deducted pro rata from income from all sources in calculating the amount to be paid to members, it seems clear that any obligation of the petitioner to make a rebate to its stockholder-members was subject to the condition that a portion of the earnings derived from their patronage should be retained by the corporation under the 6-percent provision. Thus, there was no obligation to rebate to members all the profit on

ginning done for them and no obligation to pass on to members all profit from their cottonseed. Under these circumstances, we think it must be concluded that some portion of the amounts paid to the stockholder-members consisted of profits derived from business with nonmembers,[6] and that to such extent the amounts cannot be considered as in the nature of true patronage dividends or rebates to the stockholder-members on business furnished by them. See *Pomeroy Cooperative Grain Co.*, 31 T.C. 674, affirmed on this issue (C.A. 8) 288 F. 2d 326. As stated, the respondent has determined that $4,361.91 of the $28,213.92 claimed by the petitioner as patronage rebates falls into this category. Upon the record, we cannot conclude that the respondent's determination was in error.

We cannot accept the petitioner's basic contention that its taxable income must be limited to 6 percent of the par value of its outstanding stock simply because its bylaws so provide and it has contracts with its stockholders so providing. The decision in *National Carbide Corporation* v. *Commissioner*, 336 U.S. 422, clearly requires the rejection of this contention.[7]

The petitioner makes the further contention that inasmuch as it did report taxable income in the amount of $12,812.16, it must be concluded that this was sufficient to cover any profit made by petitioner as a result of nonmember business, and that therefore the amounts paid to stockholder-members did not include any profit on nonmember business. But this argument does not take into consideration the fact that under the bylaws and contracts, as pointed out hereinabove, a part of the corporate profit on stockholder-member business was also to be corporate earnings, and not the subject of rebate to the stockholder-members.

*Decision will be entered under Rule 50.*

[6] This includes profits derived on business of those nonmembers who were tenants of members. Here the stockholder-members were not agents of their tenants in receiving profits on business of their tenants, as was true in *Producers Gin Association, A.A.L.*, 33 T.C. 608.

[7] The Supreme Court stated in that case:

"Nor do the contracts between Airco and petitioners by which the latter agreed to pay all profits above a nominal return to the former, on that account, become 'agency' contracts within the meaning of our decisions. * * * Our decisions requiring that income be taxed to those who earn it, despite anticipatory agreements designed to prevent vesting of the income in the earners, foreclose this result. [Citing *Lucas* v. *Earl*, 281 U.S. 111, and other cases.]"